1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9  RENE ANTHONY ACEDO and KENNETH          )   CASE NO. CV 15-02443 MMM (ASx)
   DZIECIOLOWSKI, individually, and on     )
10 behalf of all others similarly situated, )
                                            )   ORDER GRANTING IN PART AND
11            Plaintiffs,                    )   DENYING IN PART DEFENDANTS'
                                            )   MOTION TO DISMISS
12       vs.                                )
                                            )
13 DMAX, Ltd., an Ohio limited liability    )
   company; GENERAL MOTORS                  )
14 COMPANY, a Delaware corporation; and     )
   DOES 1-10, inclusive,                    )
15                                          )
              Defendants.                   )
16 _____ )

17

18        On January 14, 2015, Rene Anthony Acedo and Kenneth Dzieciolowski (collectively,

19 "plaintiffs") filed this putative class action on their behalf and on behalf of all similarly situated

20 individuals against DMAX, Ltd. ("DMAX"), General Motors Company ("GM"), Isuzu North America

21 Corporation, Isuzu Motors America, LLC (collectively "Isuzu"), and various fictitious defendants in Los

22 Angeles Superior Court.[1]  DMAX and Isuzu were served on March 17, 2015, and timely removed the

23 action on April 2, 2015, invoking the court's jurisdiction under the Class Action Fairness Act

24 ("CAFA"), 28 U.S.C. § 1332(d).[2]  Two weeks later, the case was transferred to this court under General

25

26

27        [1]Notice of Removal ("Removal"), Docket No. 1 (Apr. 2, 2015), Exh. B ("Complaint") at 1.

28        [2]Removal at 1.

1    Order 14-03.[3]

2         On May 11, 2015, plaintiffs filed a first amended complaint naming DMAX and GM as

3    defendants (collectively, "defendants").[4]  The first amended complaint pleads ten claims: (1) violation

4    of the Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*;[5] (2) violation

5    of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et*

6    *seq.*;[6] (3) violation of California's Unfair Competition Law ("UCL"), California Business & Professions

7    Code § 17200, *et seq.*;[7] (4) breach of implied warranty in violation of the Song-Beverly Consumer

8    Warranty Act ("Song-Beverly"), California Civil Code §§ 1791.1, 1792;[8] (5) breach of express warranty

9    under California Commercial Code § 2313;[9] (6) violation of the Michigan Consumer Protection Act

10   ("MCPA"), Michigan Compiled Laws § 445.901;[10] (7) breach of implied warranty under the MCPA,

11   Michigan Compiled Laws §§ 440.2314, 440.2315, and 445.903;[11] (8) breach of express warranty under

12   Michigan Compiled Laws § 440.2313;[12] (9) breach of written warranty pursuant to the Magnuson-Moss

13   Warranty Act, 15 U.S.C. § 2301, *et seq.*;[13] and (10) violation of the Michigan Motor Vehicle Service

14

15

16        [3]Order to Reassign Case Due to Self-Recusal, Docket No. 12 (Apr. 16, 2015).

17        [4]First Amended Complaint ("FAC"), Docket No. 17 (May 11, 2015).  Plaintiffs voluntarily
18   dismissed defendants Isuzu North America Corporation and Isuzu Motors America, LLC on April 16,
     2015.  (See Notice of Dismissal, Docket No. 11 (Apr. 16, 2015).)

19        [5]FAC, ¶¶ 158-72.
20
          [6]*Id.*, ¶¶ 173-82.
21
22        [7]*Id.*, ¶¶ 183-96.

23        [8]*Id.*, ¶¶ 197-203.
24
          [9]*Id.*, ¶¶ 204-11.
25
26        [10]*Id.*, ¶¶ 212-26.

27        [11]*Id.*, ¶¶ 227-

28        [12]*Id.*, ¶¶ 234-41.

          [13]*Id.*, ¶¶ 242-53.

Repair Act ("MVSRA"),  Michigan Compiled Laws § 257.1307.[14]

On June 1, 2015, defendants filed a motion to dismiss the first amended complaint,[15]  which plaintiffs oppose.[16]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument.  The hearing calendared for August 3, 2015, is therefore vacated, and the matter is taken off calendar.

## I.  FACTUAL BACKGROUND

### A.      Facts Alleged in the First Amended Complaint

#### 1.      The Parties

GM is a Delaware limited liability company headquartered in Detroit, Michigan.[17]  It is an indirect, wholly-owned subsidiary of General Motors Company and is one of the oldest and largest automobile manufacturers in the world.[18]  In the United States, GM markets and sells its vehicles under several brand names, including Chevrolet and GMC.[19]  DMAX is a privately held Ohio limited liability company located in Morraine, Ohio.[20]  DMAX is owned jointly by GM and Isuzu North America Corporation – GM has a 60 percent interest in DMAX and Isuzu North America Corporation has a 40 percent interest.[21]  The complaint alleges that GM and Isuzu formed DMAX in 1998 to increase GM's

---

[14]*Id.*, ¶¶ 254-57.

[15]Notice of Motion and Motion to Dismiss Plaintiffs' First Amended Complaint, Docket No. 24 (June 1, 2015); Memorandum in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion"), Docket No. 25 (June 1, 2015).  See also Reply in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Reply"), Docket No. 34 (July 20, 2015).

[16]Memorandum in Opposition to Motion to Dismiss Plaintiffs' First Amended Complaint ("Opposition"), Docket No. 32 (July 6, 2015).

[17]FAC, ¶ 19.

[18]*Id.*

[19]*Id.*

[20]*Id.*, ¶ 18.

[21]*Id.*

share of the heavy-duty truck market.[22]  To that end, DMAX was allegedly charged with designing and manufacturing the Duramax Motor, which is a 6.6 liter V-8 diesel engine made available on various GM trucks, including the GMC Sierra 2500 HD and 3500 HD, the Chevrolet Silverado 2500 HD and 3500 HD, as well as the Chevrolet Express and GMC Savana.[23]  The complaint alleges that DMAX is now the sole supplier of Duramax Motors to GM.[24]

Kenneth Dzieciolowski is a citizen of Macomb, Michigan.[25]  On September 28, 2012, he purchased a new 2012 Chevrolet Silverado 3500 HD truck equipped with an optional Duramax Motor for $58,685 from Buff Whelan Chevrolet of Sterling Heights, Michigan.[26]  Rene Anthony Acedo is a citizen of Fullerton, California, who purchased a new 2015 GMC Sierra 2500 HD equipped with a Duramax Motor for approximately $62,000 from Hardin Buick GMC in Anaheim, California, on April 1, 2014.[27]

## 2.    The Duramax Motor and Diesel Particulate Filter

The Duramax Motor is a diesel, rather than gasoline, engine.[28]  Because the Duramax Motor burns diesel fuel, it allegedly generates soot and particulate solids during the internal combustion process.[29]  Under federal environmental regulations promulgated by the Environmental Protection Agency ("EPA"), the soot and particular solids must be filtered by an exhaust system before being emitted into the atmosphere.[30]  The Duramax Motor utilizes a diesel particulate filter ("DPF") in order

---

[22]*Id.*, ¶ 28.

[23]*Id.*, ¶¶ 1, 24-25.

[24]*Id.*, ¶ 28.

[25]*Id.*, ¶ 16.

[26]*Id.*

[27]*Id.*, ¶ 17.

[28]*Id.*, ¶ 36.

[29]*Id.*

[30]*Id.*, ¶¶ 2, 36.

to filter soot and particulate solids out of the engine's exhaust before it is emitted.[31]

The DPF is allegedly a ceramic cylinder with small holes around its circumference that is attached to the end of a truck's exhaust pipes.[32]  The particulate solids produced by Duramax Motor's combustion are purportedly too large to pass through the small holes of the DPF; as a result, they remain trapped in the DPF.[33]  The complaint alleges that the DPF is designed to trap the soot and diesel particulates and burn them using extreme heat that emanates from the engine's exhaust.[34]  Because a minimum temperature of approximately 1,112 degrees Fahrenheit is required to burn the soot, the engine is purportedly required to run at higher revolutions per minute ("RPMs") than it otherwise would so it can reach a temperature where the diesel particulates will burn.[35]

### 3. The DPF Defects

Plaintiffs allege that DMAX and GM designed the DPF so that it is placed relatively far away from the Duramax Motor's exhaust manifold.[36]  Because the DPF is some distance from the exhaust manifold, the engine's exhaust allegedly cools to such a degree that by the time it reaches the DPF, the gases are not sufficiently hot to burn the particulate solids trapped in the DPF.[37]  As a result, the truck's onboard computer – the electronic control module (the "ECM") – purportedly triggers a "regeneration" cycle.[38]  Plaintiffs allege that during a regeneration cycle, the Duramax Motor automatically increases its engine speed and associated RPMs by 67 percent to produce hotter exhaust capable of burning and

---

[31]*Id.*, ¶ 3.

[32]*Id.*

[33]*Id.*

[34]*Id.*

[35]*Id.*, ¶¶ 3-4.

[36]*Id.*, ¶ 36.

[37]*Id.*, ¶ 37.

[38]*Id.*, ¶¶ 5, 37.

emptying the accumulated particulate solids in the DPF.[39]  But for the need to heat the exhaust gases, the engine purportedly would not have to operate at an increased speed or higher RPMs.[40]

The regeneration cycle allegedly lasts approximately twenty minutes.[41]  If the engine is turned off before the regeneration cycle completes, the Motor purportedly begins to regenerate the next time it is turned on and allegedly continues to do so until the engine is driven for a sufficient amount of time that a single regeneration cycle is complete.[42]  Plaintiffs allege that the DPF often fails to clean the filter of diesel particulates during normal use and operation of the class vehicles, which results in frequent regeneration cycles.[43]  The regeneration cycles, in turn, purportedly lower the truck's fuel range and economy due to the increased fuel usage needed to generate the heat required for DPF regenerations.[44]  In addition, the need to recirculate exhaust gases during regeneration allegedly contaminates the engine oil, which results in increased oil viscosity and a resultant lack of lubrication for engine bearings.[45]

Plaintiffs assert that the ECM also triggers unnecessary regenerations.[46]  The ECM computer system regulates and controls all components of the truck, including the DPF.[47]  They contend that, among other things, the ECM  continually monitors various sensors that measure, *inter alia*, the air pressure at the entrance and exit of the DPF and the amount of diesel particulate matter accumulated in it.[48]  The ECM allegedly inputs these measurements into an algorithm – the "soot model" – and

---

[39]*Id.*

[40]*Id.*, ¶ 5.

[41]*Id.*, ¶ 8.

[42]*Id.*

[43]*Id.*, ¶¶ 6-7.

[44]*Id.*, ¶¶ 6-8.

[45]*Id.*, ¶ 41.

[46]*Id.*, ¶¶ 42-43.

[47]*Id.*

[48]*Id.*, ¶ 44.

1  calculates the frequency with which the Duramax Motor must regenerate.[49]  As diesel soot accumulates

2  in the DPF, the air pressure typically increases as exhaust enters the DPF; this allegedly causes the ECM

3  to trigger a regeneration cycle.[50]

4      The complaint alleges that a number of "connecting components," i.e., hoses, gaskets, tubes, and

5  seals, which connect the DPF to the engine, become damaged by the extreme heat produced during

6  regeneration.[51]  The extreme temperatures during regeneration can allegedly create holes and leaks in

7  various air hoses; this purportedly causes air pressure sensors to report a lower than expected air

8  pressure.[52]  The air pressure readings, which indicate that no regeneration is necessary, purportedly

9  conflict with the DPF's internal sensors, which report the accumulated soot level and indicate that

10  regeneration is necessary.[53]  The conflicting sensor readings, in turn, allegedly trigger excessive

11  regenerations in trucks with Duramax Motors.[54]  The complaint asserts that leaks in connecting

12  components can result in exhaust leakage, which ultimately lowers the heat of the exhaust entering the

13  DPF and results in longer regeneration cycles.[55]  The leaks can also result in the accumulation of soot

14  in the DPF, which purportedly causes clogging in the Duramax Motor's exhaust system.[56]  This clogging

15  allegedly results in engine backpressure, which requires the use of additional fuel to maintain engine

16  performance.[57]  Plaintiffs allege, on information and belief, that "limitations, bugs, and/or errors" in the

17

18

---

19  [49]*Id.*

20  [50]*Id.*, ¶ 45.

21
22  [51]*Id.*, ¶¶ 46-47.

23  [52]*Id.*, ¶ 47.

24  [53]*Id.*

25  [54]*Id.*

26  [55]*Id.*, ¶ 48.

27  [56]*Id.*, ¶ 49.

28  [57]*Id.*

ECM's software can and do cause excessive regenerations."[58]

Each of these problems is purportedly a result of the Duramax Motor's defective design, which fails to heat the exhaust system adequately to clean the DPF effectively and causes frequent, unnecessary regenerations.[59] The first amended complaint denominates the issues collectively the "DPF Defects."[60] It alleges that, as a result of the DPF Defects, the Motor must run at higher RPMs and the driver of the truck must continue to drive even when further travel is not necessary in order to complete the regeneration cycle.[61] This allegedly results in significant fuel consumption and a reduction in fuel range, usage, efficiency, and economy, an effect the complaint denominates the "Fuel Penalty."[62]

### 4.    Purported Safety Risks Related to the DPF Defects

#### a.    Risk of Fire

During regeneration, the Duramax Motors allegedly produce exhaust with a temperature in excess of 1,292 degrees Fahrenheit.[63] Plaintiffs contend this extreme heat is very dangerous and can cause nearby material, including brush or debris, to combust abruptly.[64] Various documents generated by defendants allegedly warn of the risk of flammability during regeneration, especially repeated regeneration. The trucks' Diesel Supplement, for example, warns that "[d]uring DPF self cleaning . . . the exhaust system and exhaust gases are very hot. Do not park, or idle for an extended period of time, near or over papers, leaves, dry grass, or other things that can burn. Keep the exhaust area clear of material that could ignite or burn."[65] Furthermore, the 2015 Chevrolet Silverado owner's manual states:

---

[58]*Id.*, ¶¶ 50-52.

[59]*Id.*, ¶ 9.

[60]*Id.*

[61]*Id.*, ¶ 10.

[62]*Id.*

[63]*Id.*, ¶ 53.

[64]*Id.*

[65]*Id.*, ¶ 55.

"[I]f you leave the vehicle with the engine running, it could overheat and even catch fire.  You or others could be injured.  Do not leave the vehicle with the engine running unless you have to."[66]  Finally, a DVD course GM published internally to assist its technicians in troubleshooting Duramax Motors (the "DVD course"), allegedly confirms the danger associated with extreme exhaust heat emitted by the DPF.[67]  Plaintiffs allege that as a result of the DPF Defects, which result in extremely high exhaust temperatures and an increased risk of fire, trucks equipped with Duramax Motors could severely burn or kill their occupants and others nearby.[68]

### b.    Release of Diesel Exhaust and Toxic Chemicals

Diesel engine exhaust is a complex mixture of thousands of gases and fine particles, many of which allegedly pose a risk to human health.[69]  These include "more than 40 toxic air contaminants" and "many known or suspected cancer-causing substances, such as benzene, arsenic and formaldehyde."[70]  Plaintiffs assert that the substances contained in diesel exhaust have the potential to contribute to mutations in cells that can lead to cancer.[71]  Indeed, they allege that the State of California has determined that long-term exposure to diesel exhaust poses the highest cancer risk of any known toxic air contaminant.[72]  In fact, diesel exhaust pollution allegedly accounts for 2,400 deaths and nearly 3,000 hospital admissions for respiratory and cardiac-related diseases annually.[73]  In addition to long-term health risks, diesel exhaust can purportedly irritate the eyes, nose, throat, and lungs, and cause coughs,

---

[66]*Id.*, ¶ 56.

[67]*Id.*, ¶ 58.

[68]*Id.*, ¶ 57.

[69]*Id.*, ¶ 62.

[70]*Id.*, ¶ 62, quoting oehha.ca.gov

[71]*Id.*, ¶ 64.

[72]*Id.*

[73]*Id.*, ¶ 65, citing CA Air Resources Board.

headaches, lightheadedness, and nausea.[74]

As noted, plaintiffs contend repetitive regeneration cycles can cause leaks in the connecting components, which allow diesel exhaust to escape into the air surrounding the truck.[75]  Depending on the location of the leak, the engine emissions can enter the passenger compartment of the truck.[76]  Once diesel exhaust enters the passenger compartment, the dangerous gases and particulate matter contained in the exhaust are allegedly drawn into the passenger's lungs as he or she breathes normally.[77]  As a result, plaintiffs and class members are allegedly at a greater risk of suffering the health and safety hazards associated with diesel exhaust than others due to the DPF Defects.[78]

The DPF Defects also allegedly contribute to environmental pollution in two ways.[79]  First, the Fuel Penalty reduces the truck's fuel range and requires the consumption of higher amounts of diesel fuel, which results in increased diesel exhaust.[80]  Second, many owners of trucks with Duramax Motors modify their vehicles to circumvent the DPF Defects.[81]  Some use "delete kits" to remove the DPF from the truck completely, while others use electronic devices to remove emission controls.[82]  These alterations purportedly cause the release of particulate matter in the exhaust into the atmosphere in a trail of black smoke; it is not combusted as designed.[83]

### c.    Distractions While Driving

---

[74]*Id.*, ¶ 66.

[75]*Id.*, ¶ 61.

[76]*Id.*, ¶ 63.

[77]*Id.*

[78]*Id.*, ¶ 67.

[79]*Id.*, ¶ 68.

[80]*Id.*, ¶ 69.

[81]*Id.*, ¶ 70.

[82]*Id.*

[83]*Id.*

As noted, regeneration allegedly results in higher RPMs, causing the engine to "surge" or "chuggle."[84] Many drivers purportedly interpret this change in engine performance as a malfunction or loss of control, which purportedly confuses the driver.[85] As a result of the confusion, many drivers purportedly adjust the accelerator pedal and other controls in an attempt to identify and account for the disturbance and regain control of the engine.[86] Plaintiffs assert that this response is partly due to the significant premium customers pay for Duramax Motors and concern that an engine malfunction could result in thousands of dollars of repairs.[87] As drivers attempt to address the apparent engine issue, they purportedly reduce the attention paid to driving, the road, and other obstacles, resulting in safety risks for the driver and others.[88] Plaintiffs contend additionally that anxiety concerning an engine malfunction can quickly manifest itself physically, leading to the physical symptoms that contribute to poor driving and increased risk of an accident – i.e., muscle tension, headaches, irritability, pounding heart, sweatiness, weakness, faintness, and dizziness.[89]

### d. Risk of Traffic Accidents

Plaintiffs also allege another source of possible traffic accidents.  The DPF Defects can purportedly trigger initiation by the ECM of the "Limp Home Mode," which significantly reduces the engine's power and causes it to act erratically.[90] During the Limp Home Mode, the truck allegedly cannot accelerate above 20 to 30 miles per hour, which gives rise to a significant danger that the truck will be rear-ended by another driver; this is especially true when the Limp Home Mode is triggered on

---

[84]*Id.*, ¶¶ 71, 73.

[85]*Id.*

[86]*Id.*, ¶ 74.

[87]*Id.*

[88]*Id.*

[89]*Id.*, ¶ 75.

[90]*Id.*, ¶ 78.

1   the highway.[91]

2           **5.**    **Defendants' Purported Knowledge of the DPF Defects**

3           **a.**    **Defendants' Research**

4         Plaintiffs contend that defendants have a long history of studying diesel engines and thus are

5   well-versed in their properties and limitations.[92]  They assert that as a result, defendants knew or should

6   have known of the DPF Defects and associated Fuel Penalty prior to the sale and lease of Duramax

7   trucks to plaintiffs.[93]  Plaintiffs allege various facts purportedly supporting this contention.  First, they

8   contend GM partnered with the Oak Ridge National Laboratory ("ORNL") to design a supplemental

9   electric heater for the DPF that could reduce regeneration time by 75 percent.  Indeed, ORNL noted in

10  its 2011 annual report that GM had been studying ways to reduce the Fuel Penalty since at least 2009,

11  having completed initial research in 2010.[94]

12        GM and ORNL also purportedly spent more than $1.2 million on a project to "develop materials,

13  materials processing, and filter regeneration techniques" that would reduce the Fuel Penalty by at least

14  25 percent relative to the 2008 baseline.[95]  Plaintiffs contend that given GM's status as majority owner,

15  affiliate, technology partner, and diesel engine supplier, defendant DMAX knew or should have known

16  of the DPF Defect and Fuel Penalty-related research.[96]  As a result, they assert, the ORNL report

17  confirms that defendants knew of the DPF defect and Fuel Penalty well before 2010.[97]

18          **b.**    **GM's Troubleshooting Video**

19        As early as 2006, GM purportedly published technical videos and materials for its service

20

21        [91]*Id.*

22        [92]*Id.*, ¶ 80.

23        [93]*Id.*, ¶ 81.

24        [94]*Id.*, ¶ 84.

25        [95]*Id.*, ¶ 85.

26        [96]*Id.*, ¶ 86.

27        [97]*Id.*

28

technicians to use in troubleshooting the DPF Defects and Fuel Penalty.[98]  For example, GM allegedly created the DVD Course, a 47-minute video about DPF operation and diagnosis.[99]  The DVD Course purportedly concerned an earlier generation of the Duramax Motor – the LMM model – which was used from 2007 to 2010.[100]  The current version of the Motor – the LML model – was introduced in 2010; more than 40 percent of its parts and technology are the same as those in the LMM.[101]  Given these similarities, plaintiffs allege, GM's knowledge of the DPF Defects and Fuel Penalty in the LMM model gave them knowledge of similar problems with the LML model.[102]  Plaintiffs contend that the DVD Course and the accompanying handout demonstrate GM's awareness of the DPF Defects because both display a "symptoms document," which lists issues affected by the DPF, including "poor fuel economy."[103]  The DVD course was allegedly not disclosed to the general public or customers of GM.[104]

### c.      Customer Complaints and GM's Technical Bulletin

On October 24, 2012, GM allegedly published a technical bulletin titled "Information for Diesel Particulate Filter Service Regeneration Documentation, Service Regeneration Will Not Run, Reduced Engine Power Message Displayed."[105]  The bulletin was an internal document provided to GM service technicians to assist them in repairing vehicles; it was not made available to the general public.[106] Plaintiffs allege that GM authored the technical bulletin in response to customer complaints and its

---

[98]*Id.*, ¶ 89.

[99]*Id.*

[100]*Id.*, ¶ 90.

[101]*Id.*, ¶¶ 91-92.

[102]*Id.*, ¶ 93.

[103]*Id.*, ¶¶ 95-96.

[104]*Id.*

[105]*Id.*, ¶ 107.

[106]*Id.*

1    inspection of 2010-2011 model year trucks.[107]  In addition, plaintiffs and other consumers allegedly filed

2    complaints with the National Highway Traffic Safety Administration, as well as on GM's website,

3    regarding the performance of trucks with Duramax Motors.[108]  These included complaints regarding

4    smoke emerging from the hood caused by diesel exhaust leakage, fuel leakage generally, sluggishness

5    in vehicle handling, fuel odors inside the cab, carbon monoxide poisoning, and a house fire that began

6    inside a GM truck.[109]  Plaintiffs assert that, in combination with the technical bulletin, these complaints

7    demonstrate GM's knowledge of the DPF Defects well before October 24, 2012.[110]

8                    **6.      Defendants' Purported Failure to Disclose the DPF Defects**

9            Plaintiffs allege that defendants affirmatively misrepresented and failed to disclose to plaintiffs

10   prior to purchase of their trucks that the DPF Defects and Fuel Penalty reduce the advertised mileage

11   range for Duramax trucks and cause additional issues.[111]  They assert that defendants continue to conceal

12   the nature of the defects to this day.[112]  When consumers present their trucks to authorized GM dealers

13   complaining of the DPF Defects and Fuel Penalty, they are purportedly told that the vehicle is operating

14   normally.[113]  Plaintiffs contend that the DPF Defects and Fuel Penalty are facts a reasonable consumer

15   would consider in deciding whether to purchase or lease a vehicle.[114]  Had plaintiffs known of the

16   defects, they purportedly would not have purchased a Duramax truck;[115] as a result of plaintiffs' reliance

17   on defendants' omissions and/or misrepresentations, they have purportedly lost money and property

18

19           [107]*Id.*, ¶ 108.

20           [108]*Id.*, ¶¶ 111, 113, 118.

21
           [109]*Id.*, ¶¶ 115, 118.
22
             [110]*Id.*, ¶ 110.
23
             [111]*Id.*, ¶¶ 119, 121.
24
             [112]*Id.*, ¶ 120.
25
             [113]*Id.*, ¶¶ 125, 128.
26
             [114]*Id.*, ¶ 134.
27
             [115]*Id.*, ¶ 137.
28

1    and/or the value of their trucks has diminished.[116]

2              **7.    Defendants' Alleged Misrepresentations**

3        The EPA allegedly does not require defendants to disclose the fuel economy of Duramax trucks

4    because heavy-duty trucks are exempt from fuel economy reporting.[117]  Nonetheless, GM purportedly

5    markets and sells Duramax trucks as reliable and powerful vehicles that "offer[ ] a maximum highway

6    range of up to 680 miles on a single fill-up."[118]   Plaintiffs contend that they understood this

7    representation, which appeared on GM's websites and in its sales materials, prior to purchasing their

8    trucks and relied on it in purchasing.[119]  In addition, GM and its affiliated salespersons purportedly made

9    the same misrepresentation orally.[120]  Plaintiffs contend that because Duramax trucks have a 36-gallon

10   fuel tank, GM essentially represented that the trucks will average up to 19 miles per gallon.[121]

11   Moreover, GM allegedly asserted, in a guide to using diesel exhaust fluid with Duramax Motors, that

12   for 2011, the range between regeneration cycles "has been lengthened by 75% and is now up to 700-

13   miles.  This improves fuel economy performance."[122]

14       Plaintiffs assert that a pre-suit investigation revealed a third-party magazine review of a 2011

15   Chevrolet Silverado 2500HD equipped with a Duramax Motor, which achieved only 14 miles per gallon

16   for a range of 504 miles.[123]   Similarly, neither named plaintiff has purportedly been able to travel

17   anywhere close to 680 miles on a single tank of diesel fuel.[124]  As a result, plaintiffs assert, defendants

18   _____

19       [116]*Id.*, ¶ 138.

20       [117]*Id.*, ¶ 32.

21
         [118]*Id.*
22

23       [119]*Id.*, ¶ 29.

24       [120]*Id.*

25       [121]*Id.*

26       [122]*Id.*, ¶ 30.

27       [123]*Id.*, ¶ 32.

28       [124]*Id.*, ¶ 35.

misrepresented that Duramax trucks have a fuel range of 680 or 700 miles as well as improved fuel performance.[125]

### 8. GM's Express Warranty

GM purportedly expressly warrants each Duramax truck.[126] At all applicable times, the warranty has purportedly covered major emission control components, including the DPF, for eight years or 80,000 miles, whichever occurs first.[127] Named plaintiffs Dzieciolowski and Acedo were also purportedly covered by an additional warranty that protected diesel engine components for five years or 100,000 miles, whichever occurs first.[128] Plaintiffs contend that as of the date they filed the first amended complaint, neither of their trucks had exceeded either warranty's limitations.[129]

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

---

[125]*Id.*, ¶¶ 31, 34.

[126]*Id.*, ¶ 139.

[127]*Id.*, ¶ 141.

[128]*Id.*, ¶¶ 142-143.

[129]*Id.*, ¶¶ 144-145.

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### B.      Whether the First Cause of Action Must Be Dismissed

#### 1.      Legal Standard Governing CLRA Claims

The CLRA makes illegal various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Group, Inc*., 135 Cal.App.4th 663, 680 (2006) (quoting *Nagel v. Twin Laboratories, Inc*., 109 Cal.App.4th 39, 54 (2003)). A "reasonable consumer" is an "ordinary consumer acting reasonably under the circumstances," who "is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture. . . ." *Id*. (citing 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:17 (4th ed. 2004)).

Section 1770(a)(5) prohibits "[r]epresenting that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities which they do not have. . . ." In addition, § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another." Finally, Section 1770(a)(9) bans "[a]dvertising goods or services with intent not to sell them as advertised." These sections of the CLRA encompass deceptive omissions as well as

1   misrepresentations. *Mui Ho v. Toyota Motor Corp.*, No. 12–2672 SC, 2013 WL 1087846, *6 (N.D. Cal.

2   Mar.14, 2013) (citing *Daugherty v. American Honda Motor Company Inc*., 144 Cal.App.4th 824, 835

3   (2006)). The CLRA is "liberally construed and applied to promote its underlying purposes, which are

4   to protect consumers against unfair and deceptive business practices and to provide efficient and

5   economical procedures to secure such protection." *Colgan*, 135 Cal.App.4th at 680.

6            **2.**     **Whether Acedo Has Plausibly Alleged a CLRA Claim**

7        As noted, the CLRA encompasses both deceptive omissions and representations. See *Mui Ho*,

8   2013 WL 1087846 at *6 (citing *Daughtery*, 144 Cal.App.4th at 835). Acedo alleges that defendants

9   violated the CLRA both by making affirmative misrepresentations regarding the fuel economy of class

10   vehicles and by failing to disclose the existence and nature of the purported DPF defects.[130] The court

11   addresses each contention in turn.[131]

12

---

13       [130]See FAC, ¶¶ 160-61 ("Section 1770(a)(5) of the Civil Code prohibits representing a good as
having a characteristic that it does not possess. Defendants marketed and sold the Trucks without

14   disclosing the DPF defects and the fact that (a) they require frequent regeneration to reheat and
accelerate the exhaust gases in order to burn accumulated particulates in the DPF and (b) the actual

15   obtainable fuel range, usage and economy is less than advertised. By failing to disclose and concealing
the defective nature of the DPF system, Defendants violated section 1770(a)(5) of the Civil Code.

16   Specifically, Defendants violated section 1770(a)(5) of the Civil Code because the Trucks are held out
as having a fuel range, usage, and economy of 680 or 700 miles when they actually have a lesser fuel

17   range, usage and economy, and because Defendants omitted the DPF defects, which result in frequent
regeneration that adversely affects fuel range, usage and economy, vehicle utility and pose the health

18   and safety risks described above"); *id.*, ¶¶ 163-65 ("Section 1770(a)(7) prohibits a person from
'[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of

19   a particular style or model, if they are of another. Defendants hold out the Trucks equipped with the

20   Duramax Motor as reliable, powerful, and economical for [their] class. However, because of the DPF
Defects, the Trucks are neither reliable nor powerful at certain road and engine speeds. And because

21   the Trucks regenerate very frequently, fuel economy is also adversely affected. In other words, the
Trucks do not possess the 'standard, quality, or grade' that Defendants claim[ ]. Section 1770(a)(9)

22   prohibits a person from '[a]dvertising goods . . . with intent not to sell them as advertised.' Defendants

23   market and sell the Trucks as having a fuel range, economy, and usage that is higher than that actually
obtainable. Defendants violated section 1770(a)(9) of the Civil Code because they marketed the Trucks

24   as having a fuel range, usage, and economy that is higher than that actually obtainable. This materially

25   fake fuel range, economy, and usage claim is *prima facie* evidence of Defendants' intent not to sell the

26   Trucks as advertised"). See also Opposition at 10, 11-20.

27       [131]As an initial matter, the court notes that defendants argue that plaintiffs' allegations fail to
plausibly allege a design defect because plaintiffs have failed to demonstrate that the purported design

28   defect is not merely a result of government regulations and have also failed to demonstrate that their

**a.** **Whether Acedo Has Sufficiently Alleged a Fraudulent Representation Claim**

"The CLRA proscribes active misrepresentations about the standard, quality, or grade of goods." *Tietsworth v. Sears*, 720 F.Supp.2d 1123, 1138 (N.D. Cal. 2010) (citing *Morgan v. Harmonix Music Systems, Inc.*, No. C 08-5211 BZ, 2009 WL 2031765, *3 (N.D. Cal. July 7, 2009); *Outboard Marine Corp. v. Superior Court*, 52 Cal.App.3d 30, 36 (1975)).  Acedo's CLRA affirmative misrepresentation claim is based on defendants' purported misrepresentations concerning the fuel economy and range of trucks outfitted with a Duramax Motor.[132] He asserts that defendants have affirmatively misrepresented "on [their] websites and on sales materials, [that] the Trucks [are] fuel efficient for their class."[133] Specifically, Acedo references defendants' advertisement stating that "this available powertrain also offers a maximum highway range of up to 680 miles on a single fill-up."[134] Acedo contends that, "[s]ince the Trucks have a 36-gallon fuel tank, GM's 680-mile cruising range represents that the Trucks will average up to 19 mpg."[135] The complaint also alleges that defendants noted in a response to Frequently Asked Questions in an owner's guide that "the range between Duramax DPF regeneration cycles has been lengthened by 75% and is now up to 700 miles."[136] Based on these allegations, Acedo asserts he reasonably believed his truck would have a fuel range of 680 or 700 miles and have an average fuel economy of 19 miles per gallon.[137] In contrast, however, a third party investigation purportedly revealed that a Chevrolet Silverado 2500HD with a Duramax Motor has average fuel

---

purported design alternatives "would meet emissions standards and perform better than GM's design." (Motion at 5-7.)  Defendants proffer no authority for the proposition that such specificity is required at the pleadings and the court thus declines to dismiss the first amended complaint on this basis.

[132]*Id.*; see also Opposition at 10-11.

[133]FAC, ¶ 29.

[134]*Id.*

[135]*Id.*

[136]*Id.*, ¶ 30.

[137]*Id.*, ¶¶ 31-32.

economy of 14 miles per gallon and a range of 504 miles; Acedo asserts he "ha[s] [not] been able to travel anywhere near a distance of 680 miles [on] a single tank of Diesel fuel."[138]

Defendants argue that Acedo has failed plausibly to allege that this purported misrepresentation was likely to mislead and/or deceive the public.[139] As noted, "[w]hether a particular misrepresentation violates the . . . CLRA is determined by the reasonable consumer test." *Brown v. Hain Celestial Group, Inc.*, 913 F.Supp.2d 881, 898 (N.D. Cal. 2012) (citing *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)). Under this standard, the plaintiff must "show that members of the public are likely to be deceived." *Williams*, 552 F.3d at 938. "Dismissal of [CLRA misrepresentation] claims is appropriate where the plaintiff fails to [plead sufficient facts] to show the likelihood that a reasonable consumer would be deceived." *Brown*, 913 F.Supp.2d at 898 (citing *Freeman*, 68 F.3d at 289-90).

Defendants assert that the first amended complaint pleads no facts plausibly suggesting that defendants' representation that Duramax-equipped trucks have a maximum fuel range of 680 to 700 highway miles is false or likely to mislead the public.[140] Acedo counters that he has pled "no[n] speculative" and non conclusory factual allegations demonstrating that "GM affirmatively misrepresented that the Trucks have a 680 or 700-mile cruising range" because reasonable consumers would "expect and assume that a vehicle will achieve the range advertised by its manufacturer" and it is not possible to travel the advertised distance.[141] The court is not persuaded by Acedo's argument.

Acedo contends defendants' advertisement is false because he "ha[s] [not] been able to travel anywhere near a distance of 680 miles with a single tank of Diesel fuel" and a third party research firm calculated an actual range of approximately 504 miles.[142] As a consequence, he asserts, the advertised

---

[138]*Id.*, ¶¶ 32, 35.

[139]Motion at 14-17.

[140]*Id.*

[141]Opposition at 10, 14.

[142]*Id.* at 10 (citing FAC, ¶¶ 12, 35).

range was "never obtainable" and the advertisement constituted an actionable misrepresentation.[143]  As defendants observe, however, GM's advertisement stated that Duramax-equipped trucks could achieve up to "a maximum highway range of up to 680 miles on a single fill-up."[144]  While Acedo asserts he has never "been able to travel anywhere near a distance of 680 miles with a single tank of Diesel fuel,"[145] he does not allege the conditions under which he drove his vehicle.  For example, Acedo does not allege whether he drove his truck on the highway or in the city, or whether he encountered traffic or were driving on the open road.  Similarly, Acedo pleads no facts as to the test criteria used by the third party research firm that calculated an actual fuel range of approximately 504 miles.  Such facts are particularly important here, as defendants allegedly misrepresented that the trucks had a "maximum highway range" of 680 miles.[146]  Absent facts demonstrating that Acedo was unable to achieve the advertised range under highway conditions, no plausible inference arises that defendants' advertisement was false.  Accordingly, the court grants defendants' motion to dismiss Acedo's CLRA claim based on defendants' purported affirmative misrepresentations.[147]

---

[143]*Id.* at 14.

[144]FAC, ¶ 29 ("In addition to its reliability and power claims, GM also affirmatively misrepresents, on its websites and on sales materials, the Trucks as fuel efficient for their class: 'this available powertrain also offers a maximum highway range of up to 680 miles on a single fill-up").

[145]*Id.*, ¶ 35.

[146]*Id.*, ¶ 29.

[147]Even had Acedo adequately pled falsity, moreover, he does not appear to have alleged sufficiently that the purported misrepresentation is likely to confuse or mislead a reasonable consumer.  As defendants note, Acedo's pleading of the language of the advertisement omits an explicit disclaimer stating that "[y]our range may be less."  (See Motion at 2.)  Similarly, although Acedo contends that a reasonable consumer is likely to be misled and to believe that his or her average fuel economy will be 19 miles per gallon (680 miles/36 gallon tank), this inference is based on what appears to be an unreasonable interpretation of the advertisement's language.  The advertisement states that the *maximum highway fuel range* is 680 miles.  It contains no representations concerning fuel economy.  Acedo's assertion that GM's statement gives rise to an inference that a reasonable consumer would understand that he or she could achieve *average fuel economy* while driving in the city or on the highway of 19 miles per gallon arises is based on an unwarranted assumption that the vehicle's maximum average fuel economy (680 miles/36 gallons) would be consistent across all driving conditions.  Because the court dismisses the claim on other grounds, it does not definitively determine whether Acedo has sufficiently pled that the statements were likely to mislead a reasonable consumer.  The court offers these comments

**b.**     **Whether Acedo Has Sufficiently Alleged a Fraudulent Omission Claim**

**(1)**     **Whether Acedo's Allegations Satisfy the Heightened Pleading Requirement of Rule 9(b)**

The parties agree that Acedo's CLRA claim "sounds in fraud" because it is based on defendants' allegedly fraudulent omission and/or concealment of material information concerning the DPF Defects.[148]  This type of claim is subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 754 F.Supp.2d 1145, 1170 n. 17 (C.D. Cal. 2010).  Generally, a plaintiff must plead the "time, place, and specific content" of allegedly fraudulent conduct to satisfy Rule 9(b).  See *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *Cirulli v. Hyundai Motor Co.*, No. SACV 08–0854 AG (MLGx), 2009 WL 5788762, *4 (C.D. Cal. June 12, 2009) ("Generally, a plaintiff must plead 'with particularity' the time and place of the fraud, the statements made and by whom made, an explanation of why or how such statements were false or misleading when made, and the role of each defendant in the alleged fraud," citing *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1547–49 (9th Cir. 1994) (en banc); *Lancaster County Hospital v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)).  When a claim rests on an alleged fraudulent omission, however, the Rule 9(b) standard is somewhat relaxed because "a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act." *Id.* (citing *Washington v. Baenziger*, 673 F.Supp. 1478, 1482 (N.D. Cal. 1987)).

Nonetheless, a plaintiff alleging fraudulent omission or concealment must still plead the claim with particularity. See *Bias v. Wells Fargo & Co.*, 942 F.Supp.2d 915, 935 (N.D. Cal. 2013) ("Although Plaintiffs' allegations do allege a fraud based in part on omissions, a plaintiff must still plead such claim with particularity," citing *Kearns*, 567 F.3d at 1126 ("Because the Supreme Court of California has held

---

merely for Acedo's consideration in filing an amended complaint.

[148]Motion at 3; Opposition at 5.

that nondisclosure is a claim for misrepresentation in a cause of action for fraud, it (as any other fraud claim) must be pleaded with particularity under Rule 9(b)"); *Marolda v. Symantec Corp.*, 672 F.Supp.2d 992, 1002 (N.D. Cal. 2009) ("The Ninth Circuit has recently clarified that claims of nondisclosure and omission, as varieties of misrepresentations, are subject to the pleading standards of Rule 9(b)")); see also *Eisen v. Porsche Cars North America, Inc*., No. CV 11–9405 CAS, 2012 WL 841019, *3 (C.D. Cal. Feb.22, 2012) ("Although claims based on an alleged fraudulent omission or concealment can succeed without the same level of specificity required by a normal fraud claim . . . the contention that ... nondisclosure claims need not be pleaded with particularity is unavailing" (internal quotation marks and citations omitted)).   Specifically, a plaintiff must "set forth an explanation as to why [the] omission complained of was false and misleading" to state a claim under Rule 9(b).  *Bias*, 2013 WL 1787158 at *12 (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548).  "[T]o plead the circumstances of [the] omission with specificity, plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Eisen*, 2012 WL 84109 at *3 (citing *Marolda*, 672 F.Supp.2d at 1002).

Although defendants raise Rule 9(b) as grounds for dismissal, they do not state directly how Acedo has purportedly failed to satisfy this standard, asserting only, in conclusory fashion, that Acedo has "not ple[d] particularized facts."[149]  Defendants' failure to provide any substantive argument concerning the manner in which Acedo's allegations failed to satisfy Rule 9(b)'s particularity requirement, without more, warrants denial of the motion to the extent based on this ground.  Notwithstanding defendants' failure to argue the point substantively, however, the court considers whether Acedo has sufficiently alleged the circumstances related to defendants' purportedly fraudulent

---

[149]See, e.g., Motion at 7 ("[P]laintiffs have not pleaded particularized facts showing an unreasonable safety risk caused by the alleged design defect, as specifically required by *Kearns*, *Wilson*, and *Grodzitsky*"); *id.* at 10 ("Here what is lacking is any factual content – let alone particularized facts – plausibly showing *that the alleged DPF design defect has ever caused exhaust intrusion*, as required by *Wilson*").  See also, e.g., *id.* at 7 ("Accordingly, the alleged 'design defect' is not plausible, and plaintiffs do not satisfy *Twombly* and *Iqbal*, let alone Rule 9(b)").

1    omission in a way that satisfies Rule 9(b).

2          Having done so, the court concludes that Acedo has alleged his fraudulent omission/concealment

3    claims with sufficient particularity under Rule 9(b). Acedo pleads "who" engaged in concealment

4    (defendants);[150] "what" was omitted and/or concealed (DPF defects and the related Fuel Penalty, which

5    caused Duramax-equipped trucks to experience repeated regeneration cycles resulting in lower fuel

6    economy);[151] "why" the information was not disclosed (to sell more class vehicles at a premium price

7    and to avoid having to reimburse costs incurred by customers associated with identifying and fixing the

8    defect);[152] and "how" defendants allegedly concealed the information (by denying, following the receipt

9    of customer complaints, that there was a known defect and by assuring consumers that their vehicles had

10   no defect).[153] Acedo has thus adequately pled the particulars of defendants' allegedly fraudulent

11   omissions. See, e.g., *Herremans v. BMW of North America, LLC*, No. , 2014 WL 5017843, *10 (C.D.

12   Cal. Oct. 3, 2014) ("BMW argues that Herremans has failed to plead the fraudulent omission adequately

13   under Rule 9(b). It asserts that Herremans' CLRA and UCL claims relies on 'conclusory allegations

14   devoid of details or substance on critical elements.' BMW cites as an example Herremans' allegation

15   that it 'knew' of the alleged defect and notes that she pleads no facts that would support a finding of

16   knowledge. It also faults Herremans for failing to plead the date or dates on which it purportedly

17   learned of the defect so as to demonstrate that it knew of the problem at the time she purchased her

18   vehicle. BMW contends that Herremans' 'reliance allegations suffer from the same defect' by omitting

19

20          [150]FAC, ¶¶ 119-22.

21          [151]*Id.*, ¶¶ 9-10, 121-22.

22          [152]*Id.*, ¶¶ 15, 163-64, 167. Acedo alleges that defendants knowingly failed to disclose a material
23   defect to him and other class members at the time they purchased the class vehicles. (Id., ¶ 167.) He
     asserts that he and other class members would not have purchased the class vehicles had they known
24   of the defect. (*Id.*) Finally, Acedo contends that defendants advertised the vehicles as being of a
     particular "standard, quality, or grade" (i.e., non-defective), and had no intent to sell them as advertised.
25   (*Id.*, ¶¶ 163-64.) Construed in Acedo's favor, these allegations give rise to an inference that defendants
26   failed to disclose the purported defect so that it could (1) sell more class vehicles (because the vehicles
     would not have been purchased had the defect been disclosed); or (2) sell class vehicles at a premium
27   price (because a vehicle's value is reduced by the presence of a defect).

28          [153]*Id.*, ¶¶ 112, 125.

the specifics of her reliance on its alleged omission.  Herremans counters that her claims are sufficient under Rule 9(b).  She contends that she has adequately pled that BMW was in exclusive possession of certain facts; that BMW knew those facts had been withheld from consumers; that the facts withheld were material; and that she relied on the absence of any defect.  The court concludes that Herremans has pled her fraudulent omission/concealment claims with sufficient particularity under Rule 9(b).  Herremans pleads 'who' engaged in concealment (BMW); 'what' was omitted and/or concealed (a water pump defect that causes the class vehicles' engines to overheat and creates a risk of catastrophic engine failure); 'why' the information was not disclosed (to sell more class vehicles at a premium price and to avoid having to reimburse costs incurred by customers associated with identifying and fixing the defect); and 'how' BMW allegedly concealed the information (by denying, following the receipt of numerous customer complaints, that there was a known mechanical water pump problem, and by assuring Herremans and class members that repairs were permanent, rather were temporary, fixes for the problem).   Herremans has thus adequately pled the particulars of BMW's allegedly fraudulent omissions" (citations omitted));  *In re Toyota Motor Corp.*, 754 F.Supp.2d at 1190–91 (finding that plaintiffs had sufficiently pled fraudulent concealment where they alleged "the 'what' (concealment of [a sudden unintended acceleration defect] . . . ), the 'why' (to induce customers to purchase Toyota cars at the prices sold . . . ), and the 'how' (instead of telling consumers about SUA problems, the problems were concealed so that Toyota's business would not be disrupted by NHTSA investigations and/or recalls and . . . negative publicity)"); *Ehrlich v. BMW of North America, LLC*, 801 F.Supp.2d 908 (C.D. Cal. 2010) (denying a motion to dismiss CLRA, UCL, and fraudulent concealment claims where plaintiff pled with particularity how the design was defective, how BMW discovered the defect, the steps BMW took to conceal the defect, and the fact that the defect posed an injury risk to a driver's head and neck).

As in these cases, Acedo's allegations of fraudulent omission and concealment are sufficiently particular to satisfy Rule 9(b).  Consequently, the court denies defendants' motion to dismiss Acedo's CLRA claim for failure to satisfy Rule 9(b)'s heightened pleading standard.

### (2)   Whether Acedo Plausibly Alleges Fraudulent Omissions

For an omission to be actionable under the CLRA and UCL, "the omission must be contrary to

a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty*, 144 Cal.App.4th at 835; see also *Berryman v. Merit Prop. Mgmt., Inc*., 152 Cal.App.4th 1544, 1557 (2007) ("[A] failure to disclose a fact one has no affirmative duty to disclose is [not] 'likely to deceive' anyone within the meaning of the UCL") (quoting *Daugherty*, 144 Cal.App.4th at 838). The California Court of Appeal has held that there are four circumstances in which a duty to disclose can arise:

> "(1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." *Collins v. eMachines, Inc*., 202 Cal.App.4th 249, 255–56 (2011) (citing *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997)).

"[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a 'reasonable [consumer]' would deem it important in determining how to act in the transaction at issue." *Collins*, 202 Cal.App.4th at 256 (citing *Engalla v. Permanente Medical Group, Inc*., 15 Cal.4th 951, 977 (1997)).

Omission-based claims outside the warranty period can only concern a failure to disclose defects that are contrary to an affirmative representation or that pose safety risks. See *Elias v. Hewlett-Packard Co.*, 950 F.Supp.2d 1123, 1135 (N.D. Cal. 2013) ("[F]or omission-based claims outside the warranty period, '[a] manufacturer's duty to consumers is limited to . . . [an] affirmative misrepresentation or a safety issue,'" citing *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 988 (N.D. Cal. 2010)); see also *Herremans*, 2014 WL 5017843 at *12 ("'[W]here, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be 'merely' the cost of the product's repair . . . ; rather, for the omission to be material, the failure must pose 'safety concerns.' 'In other words, under California law, and as recently described by the Ninth Circuit: A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue'" (citations omitted)). Where, as here, a purported design defect manifests during the warranty period,

however, a plaintiff's fraudulent omission claim is not limited to defects implicating safety concerns. See, e.g., *Rasmussen v. Apple, Inc.*, 27 F.Supp.3d 1027, 1037-38 (N.D. Cal. 2014) (collecting cases and holding that plaintiff could state a fraudulent omission claim under the CLRA based on defects that manifested themselves during the warranty period, even if those defects did not implicate safety concerns); *Elias*, 950 F.Supp.2d at 1135-36 (distinguishing *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143 (9th Cir. 2012), which held that, "for [an] omission to be material, the failure must post 'safety concerns'" on the basis that the *Wilson* court recognized the "requirement related only to defects arising outside of the warranty period," and concluding that "[a] [p]laintiff may allege fraudulent omissions beyond safety-related concerns if those omissions led to malfunctions during the warranty period"); *Hodges v. Apple, Inc.*, No. 13-cv-01128-WHO, 2013 WL 6698762, *7 (N.D. Cal. Dec. 19, 2013) ("[A] plaintiff can state a UCL or CLRA omissions claim without alleging a [ ] safety risk where the facts involve an undisclosed defect present from the time of manufacture of which the defendant was aware"); *Apodaca v. Whirlpool Corp.*, No. SACV 13-00725 JVS, 2013 WL 6477821, *7 (C.D. Cal. Nov. 8, 2013) ("The Court does not find Defendant's case law supports the claim that a safety defect must be alleged for a duty to disclose to arise within the warranty period").[154]

Because the purported DPF Defects manifested themselves during the warranty period – in fact, within three months of Acedo's purchase of the vehicles[155] – Acedo need not, contrary to defendants' assertion,[156] allege that the DPF Defects constituted an unreasonable safety risk.  Instead, he need only allege facts showing that defendants had a duty to disclose the DPF Defects and failed to do so.

---

[154]See also *Donohue v. Apple, Inc.*, 871 F.Supp.2d 913, 926 (N.D. Cal. 2012) (distinguishing *Wilson* and its progeny, which "reject[ ] duty to disclose claims based on product defects that manifested themselves after the expiration of a manufacturer's express warranty," from plaintiff's claim that a product "failed to perform as expected" within the warranty period); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 488 (C.D. Cal. 2012) ("[In] *Wilson* . . . the Ninth Circuit clarified that the requirement to prove a safety hazard did not apply where the plaintiff 'began experiencing problems . . . within the express warranty period,'" citing *Wilson*, 668 F.3d at 1143 & n. 1).

[155]FAC, ¶ 11.

[156]Defendants contend Acedo has not adequately alleged that they knew of a purported safety defect and thus cannot demonstrate that they had a duty to disclose the existence of the DPF Defects at the time of sale.  (See Motion at 13-14; Reply at 9-11.)

As noted, "a duty to disclose may arise: '(1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.'" *Elias*, 950 F.Supp.2d at 1137 (citing *Collins*, 202 Cal.App.4th at 255-56; *LiMandri*, 52 Cal.App.4th at 336). Acedo does not allege that he is in a fiduciary relationship with defendants, nor that defendants made a partial representation. Rather, he contends that defendants had exclusive knowledge of material facts that they actively concealed from Acedo and other putative class members.[157]

Defendants note that Acedo has alleged knowledge on information and belief, and that "[n]o factual allegations [are pled that] support plaintiff['s] 'information and belief.'"[158] Acedo counters that he has pled sufficient facts suggesting that defendants knew of the DPF Defects and related Fuel Penalty

---

[157]"[I]n order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Ostreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 971 (N.D. Cal. 2008) (quoting *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1095 (N.D. Cal. 2007), in turn quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993)). As noted, "[m]ateriality . . . is judged by the effect on a 'reasonable consumer.'" *Id.* (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1360 (2003)). Plaintiffs allege that the DPF Defects and Fuel Penalty are facts that reasonable consumers would consider material in deciding whether to purchase or lease a class vehicle. Specifically, they assert that a reasonable consumer would believe that a truck would be able to operate "free of defects" during the warranty period and that the DPF Defects – i.e., frequent regeneration, requiring class members to continue driving their cars, and the attendant decrease in fuel economy and mileage – were inconsistent with those expectations. (See FAC, ¶¶ 11, 134, 144-45; see also Opposition at 17-18.) Other than asserting that the defect is not "safety-related," defendants do not dispute that the alleged DPF Defects would be material to a reasonable consumer. Accordingly, the court concludes that plaintiffs have sufficiently alleged that the DPF Defects are a material fact for purposes of Acedo's CLRA omissions claim.

[158]*Id.* at 13. ("No factual allegations support plaintiffs' 'information and belief.' What 'pre-release testing data' or 'aggregate data from GM dealers? 'Early consumer complaints' about what? What components had 'high failure rates' or unusual replacement part sales? If 'technical automotive publications' really criticized the DPF design, why have plaintiffs chosen not to cite them. If these allegations are not simply made up, they are at best naked, conclusory boilerplate similar to the abject speculation that the Ninth Circuit rejected in *Wilson*").

at the time he and the putative class members purchased his trucks.[159]

Defendants note that Acedo pleads on information and belief that "[d]efendants knew or should have known that the Trucks are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation."[160]  Acedo also asserts, on information and belief, that

> "before Plaintiffs purchased and leased their Trucks, Defendants knew about the DPF
> Defects and Fuel Penalty through sources not available to consumers, including pre-
> release testing data, early consumer complaints about the DPF Defects to Defendants and
> GM's dealers, testing conducted in response to those complaints, high-failure rates and
> replacement part sales data, aggregate data from GM dealers, technical automotive
> publications criticizing the DPF design in the Trucks, and other sources of aggregate
> information about the problem."[161]

Defendants contend that such allegations are insufficient to plead plausibly that defendants knew of the defect.  The court agrees.  See, e.g., *Wilson*, 668 F.3d at 1147 ("The allegation that HP, as the manufacturer, had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted HP to the defect'"); *Herremans*, 2014 WL 5017843 at *17 ("Herremans' allegation that BMW 'was well aware and knew' of the defect prior to distributing the class vehicles in 2006 is conclusory.  Her general reference to 'internal testing, records of customer complaints, dealership repair records, and other internal sources' provides little, if any, factual foundation for her conclusion that BMW knew of the defect.  Herremans does not describe the internal testing or what it shows.  She does not identify the repair records, their volume, or how they revealed the defect.  She provides no detail concerning the customer complaints, when they were submitted, what they said, or how many came directly to BMW and how many went to NHTSA.  Finally, she offers no information concerning the 'other internal sources' she references. In other paragraphs of the complaint, Herremans references 'pre-release testing data, warranty data,

---

[159]Opposition at 11-13.

[160]FAC, ¶ 120.

[161]*Id.*, ¶ 123.

29

customer complaint data, and replacement part sales data' as 'other internal sources of aggregate information about the problem.  This allegation is similarly conclusory and deficient because it does not plausibly indicate that BMW knew of the defect prior to the time it distributed the class vehicles'").  Acedo, however, does not rely on these allegations alone.

Rather, he alleges specific facts indicating that defendants were aware of the excessive regenerations and attendant decrease in fuel economy and range.  Acedo pleads that beginning in 2009, defendants partnered with the federal government to research and investigate the regeneration issue so as to decrease the need for regeneration and related loss of fuel economy.[162]  He also alleges that defendants published various technical videos and other materials for their service teams related to the regeneration issue and purported Fuel Penalty.[163]  Acedo contends these materials were not disclosed to the public, but were maintained internally.[164]  Defendants assert that Acedo's reference to a technical video does not give rise to a plausible inference that defendants knew of the DPF Defects and Fuel Penalty because the video was produced in 2006 and concerned an earlier version of the Duramax Motor.[165]  They contend the DVD was created "before the start of production of vehicles equipped with the previous LMM generation Duramax engine," and thus showed "various *possible* symptoms that *might* occur."[166]  As a result, defendants argue, their publication of the DVD cannot give rise to a plausible inference that they knew of the DPF Defects and Fuel Penalty in plaintiffs' Duramax-equipped trucks.[167]  The court is not persuaded.  Although defendants assert the video merely documented "possible symptoms that might occur," it confirms that defendants' knowledge of the decreased fuel economy and range associated with the DPF was not hypothetical, but based on measurements taken

---

[162]FAC, ¶¶ 80-87.

[163]*Id.*, ¶¶ 89-95.

[164]*Id.*

[165]Motion at 21-22.

[166]*Id.* at 22.

[167]*Id.*

during "an actual road test."[168]  The fact that defendants observed DPF-related defects while testing the Duramax Motor plausibly suggests that they were on notice of the decreased fuel economy and engine performance plaintiffs characterize as the DPF Defects and Fuel Penalty.

That the video concerned an earlier generation Duramax Motor does not, at this stage of the litigation, make Acedo's allegations that defendants knew of the defect in class vehicle engines implausible.  As Acedo alleges, more than 40% of the parts and technology incorporated into the current version of the Duramax Motor were also used in the earlier LMM model; these include the DPF and related components.[169]  While, as defendants note, the current generation of the Duramax Motor also incorporates various components not included in the LMM generation motor,[170] this does not alter the fact that the current motor has much in common with the LMM version.

In sum, Acedo's allegations that defendants participated in research concerning the regeneration issue in an effort to decrease the related Fuel Penalty and that they subsequently published an internal video and materials based on that research suffices plausibly to plead that defendants knew of the DPF Defects at the time Acedo purchased his vehicle, and concealed that information from the class.  Acedo has thus sufficiently alleged that defendants had a duty to disclose the DPF Defects and failed to do so.  As a result, their CLRA claim is not deficient, and defendants' motion to dismiss Acedo's CLRA omissions claim is therefore denied.

**C.    Whether the Second and Third Causes of Action Must Be Dismissed**

**1.    Legal Standard Governing UCL Claims**

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction."  CAL. BUS. & PROF. CODE §§ 17201, 17203.  "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  CAL. BUS. & PROF. CODE § 17200. The California Supreme Court has construed the statute broadly.  See *Cel--Tech Communications, Inc.*

---

[168]FAC, ¶¶ 95-96.

[169]*Id.*, ¶¶ 90-93.

[170]Motion at 21-22.  See FAC, Exh. 3.

*v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999) ("[Section 17200] defines 'unfair competition to include any unlawful, unfair or fraudulent business act or practice. . . . Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law. . . . By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. . . . However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc*., 139 Cal.App.4th 659, 676–77 (2006) ("The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. . . .' Thus, the scope of the UCL (Bus. & Prof.Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)).

"'Although the UCL targets a wide range of misconduct, its remedies are limited because UCL actions are equitable in nature.'" *Pom Wonderful LLC v. Welch Foods, Inc.*, No. CV 09-567 AHM (AGRx), 2009 WL 5184422, *2 (C.D. Cal. Dec. 21, 2009) (quoting *Buckland v. Threshold Enterprises*, 155 Cal.App.4th 798, 812 (2007)). As a result, "[r]emedies for private individuals bringing suit under the UCL are limited to restitution and injunctive relief." *Id.* (citing *Madrid v. Perot Systems Corp.*, 130 Cal.App.4th 440, 452 (2005)); see also, e.g., *Asghari v. Volkswagen Group of America, Inc.*, 42 F.Supp.3d 1306, 1324 (C.D. Cal. 2013) ("Individuals' remedies under the UCL are restricted to injunctive relief and restitution. A plaintiff may recover lost money in the form of restitution under the UCL, but not damages," citing *Korea Supply v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144, 1152 (2003) (holding that "disgorgement of profits allegedly obtained by means of an unfair business practice" is not "an authorized remedy under the UCL where the profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest")); *Freeman v. ABC Legal Services, Inc.*, 877 F.Supp.2d 919, 923 (N.D. Cal. 2012) ("Only two forms of relief are available [under the UCL]: restitution and/or an injunction").

## 2.   Whether the Second Cause of Action Must Be Dismissed

Acedo's second cause of action for violation of the UCL is asserted under the UCL's unlawful prong.[171]   To state a claim for an "unlawful" business practice under the UCL, a plaintiff must assert the violation of any other law." *Saldate v. Wilshire Credit Corp.*, 268 F.R.D. 87, 103 (E.D. Cal. 2010) (citing *Cel-Tech Communications, Inc.*, 20 Cal.4th at 180 ("By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other law and treats them as unlawful practices that the unfair competition law makes independently actionable" (citation omitted)).   As the predicate violation giving rise to his UCL claim under the unlawful prong, Acedo alleges that defendants have violated California's False Advertising Law ("FAL"), California Business & Professions Code § 17500, by affirmatively misrepresenting the fuel range, economy, and fuel usage of trucks with Duramax Motors in their advertisements.[172]   California's FAL prohibits the dissemination of false or misleading statements in advertising. CAL. BUS. & PROF. CODE § 17500.[173]   "Section 17500 has been broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although

_____

[171]FAC, ¶ 174.

[172]See *id.*, ¶¶ 175-78.   See also Opposition at 20 ("Defendants have violated the fraudulent and unlawful prong of the UCL by falsely advertising and affirmatively misrepresenting the fuel range, economy, and usage of the Trucks").

[173]Section 17500 provides: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine." CAL. BUS. & PROF. CODE § 17500.

true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Colgan*, 135 Cal.App.4th at 679 (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951 (2002) (internal quotation marks omitted)).

As noted, Acedo bases his second cause of action on purported misrepresentations concerning the fuel range, economy, and fuel usage of trucks with Duramax Motors. These are the same allegations that support Acedo's CLRA false representation claim. As the court has discussed, Acedo does not plead facts that plausibly suggest defendants' purported misrepresentations would be misleading to a reasonable consumer. Because false advertising under the FAL is judged by the same "reasonable consumer" standard used to evaluate CLRA claims, the court's analysis of Acedo's CLRA affirmative misrepresentation claim applies with equal force in assessing whether Acedo has plausibly alleged a violation of the FAL as a predicate for his UCL claim. See, e.g., *Victor v. R.C. Bigelow, Inc.*, No. 13-cv-02976-WHO, 2014 WL 1028881, *20 (N.D. Cal. Mar. 14, 2014) ("For the same reasons that Victor fails to adequately state a claim under the 'fraudulent' and 'unfair' prongs of the UCL, and the CLRA, he also fails to adequately state a claim under the FAL. Victor's Fourth and Fifth Causes of Action mare DISMISSED"); *Jones v. ConAgra Foods, Inc.*, 912 F.Supp.2d 889, 899 (N.D. Cal. 2012) (jointly analyzing UCL, CLRA, and FAL claims); *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1231-35 (N.D. Cal. 2012) (same). Accordingly, for the same reasons that the court has found that Acedo's affirmative misrepresentation claim fails to state a claim, the second cause of action also fails to state a claim. The court thus grants defendants' motion to dismiss the second cause of action for violation of the UCL.

### 3. Whether the Third Cause of Action Must Be Dismissed

Defendants next seek to dismiss Acedo's third cause of action for violation of the UCL.[174] This claim alleges a violation of the UCL's unlawful prong based on the fact that defendants were purportedly guilty of fraudulent omissions that violated the CLRA.[175] Because the court has concluded that Acedo has plausibly alleged a CLRA omissions claim, he has likewise adequately pled a claim for

---

[174]Motion at 23.

[175]See FAC, ¶¶ 185-95.

violation of the UCL under the UCL's unlawful prong.  See, e.g., *Falco v. Nissan North America Inc.*, No. CV 13-00686 DDP (MANx), 2013 WL 5575065, *10 (C.D. Cal. Oct. 13, 2013) ("For a claim based upon unlawful business practices under the UCL, the UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'  Plaintiffs assert that NNA's conduct violates the unlawful prong on the grounds that it violates the CLRA and the Song–Beverly Warranty Act.  NNA asserts that it has violated neither law.  However, because the court finds that Plaintiffs' pleadings under the CLRA and the Song–Beverly Warranty Act are sufficient to survive NNA's motion to dismiss, the court finds that Plaintiffs' pleadings as to the UCL's unlawful prong are likewise sufficient" (citations omitted)); *Keegan v. American Honda Motor Co., Inc.*, 838 F.Supp.2d 929, 944 n. 50 (C.D. Cal. 2012) ("As plaintiffs have successfully alleged a CLRA violation (as well as violations under other statutes), they have successfully stated a claim under the UCL's "unlawful" prong").

Defendants argue, however, that Acedo's UCL claim must be dismissed to the extent he seeks restitution, because Acedo "allege[s] that [he] bought [his] vehicle[ ] from third-party dealerships, not GM" and has not pled sufficient facts showing that "[his] purchase monies [can be traced] [ ]to GM's possession."[176]  Acedo counters that he has adequately alleged that "[d]efendants earned direct and indirect profits from the deceptive sale of the [t]rucks."[177]  The allegations referenced, however, do not plausibly suggest that defendants possess "money or property" with which Acedo parted.  *Colgan*, 135 Cal.App.4th at 699.  Indeed, Acedo specifically alleges that he paid *GM dealerships*, not defendants, for his vehicles.[178]  Because Acedo has not alleged facts indicating that *defendants*, as opposed to independent GM dealers, obtained Acedo's money or property, or that defendants are in possession of funds that rightly belong to Acedo, he has failed to state a plausible claim for restitution under the UCL.  Accordingly, the court dismisses Acedo's third cause of action.  See, e.g., *Asghari*, 42 F.Supp.3d at 1324-25 ("Plaintiffs have not alleged facts indicating that defendants obtained Calver's money or

---

[176]Motion at 23.

[177]Opposition at 20-21.

[178]FAC, ¶¶ 16-17, 35.

property nor that defendants are in possession of funds rightfully belonging to her.  Rather, the complaint alleges that Calver bought her vehicle from a third party.  The complaint thus fails to plead facts showing that Calver has a plausible claim to restitution under the UCL.  The court therefore dismisses her UCL claim for restitution").[179]

### D.    Whether the Sixth Cause of Action Must Be Dismissed

Dzieciolowski alleges in the sixth cause of action that defendants have violated the Michigan Consumer Protection Act ("MCPA"), MICH. COMP. LAWS § 445.901.  "Under the MCPA, '[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful.'"  *Date v. Sony Electronics, Inc.*, No. 07-cv-15474, 2010 WL 3702599, *12 (E.D. Mich. Sept. 16, 2010) (citing MICH. COMP. LAWS § 445.903(1)).

Defendants do not explicitly seek dismissal of the sixth cause of action in their motion.  In fact, the only reference they make to the MCPA is an assertion in the legal standards section of the motion that "Rule 9(b) applies to . . . plaintiff Dzieciolowski's claim[ ] under the Michigan Consumer Protection Act" because the claim sounds in fraud.[180]  As noted in the discussion of Acedo's CLRA claim, the first amended complaint alleges the circumstances of defendants' purported fraud with sufficient particularity to satisfy Rule 9(b).  Because defendants do not seek dismissal of the MCPA claim on any other basis – indeed, provide no substantive argument concerning dismissal of the MCPA claim – the court declines to dismiss the sixth cause of action.

---

[179]Acedo argues that *Asghari* is distinguishable because, unlike *Asghari*, he alleges that he purchased his vehicles from GMC and Chevrolet GM dealerships, which are "franchisees subject to a degree of control by GM, rendering them agents under the doctrine of apparent authority." (Opposition at 21.)  Acedo, however, does not allege facts to this effect in the first amended complaint, and he cannot supplement the pleading by asserting new facts in his opposition to defendants' motion to dismiss. See, e.g., See, e.g., *Nathanson v. Polycom, Inc.*, __ F.Supp.3d __, 2015 WL 1517777, *13 (N.D. Cal. Apr. 3, 2015) ("Plaintiff argues in his opposition brief that Item 402 of SEC Regulation S-K required Polycom to disclose all compensation provided to Miller in Form 10-Ks and proxy statements. However, Plaintiff has not pleaded these allegations in his complaint.  As a result, the Court does not address them," citing *Bruton v. Gerber Products Co.*, 961 F.Supp.2d 1062, 1078 (N.D. Cal. 2013)); *Elizabeth L. v. Aetna Life Insurance Co.*, No. CV 13-2554 SC, 2014 WL 2621408, *4 (N.D. Cal. June 12, 2014) (refusing to consider theories of liability not pled but raised for the first time in opposition to a motion to dismiss).

[180]Motion at 3.

1          **E.**      **Breach of Express Warranty Claims**

2            **1.**      **Whether the Fifth Cause of Action Must Be Dismissed**

3        Defendants next seek dismissal of Acedo's breach of express warranty claim against GM in

4    violation of California Commercial Code § 2313.[181]   California Commercial Code § 2313, which

5    defines express warranty, applies to "transactions in goods."  See CAL. COM. CODE § 2102; see also

6    CAL. CIV. CODE § 1791.2(a)(1) (defining an "express warranty" as "[a] written statement arising out

7    of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or

8    retailer undertakes to preserve or maintain the utility or performance of the consumer good or to

9    provide compensation if there is a failure in utility or performance"); BLACK'S LAW DICTIONARY

10   at 1582 (7th ed. 1999) (defining "express warranty" as "[a] warranty created by the overt words or

11   actions of the *seller*"); 3 B.E. Witkin, SUMMARY OF CALIFORNIA LAW, §§ 55-56 (9th ed. 1990);

12   Richard A. Lord, WILLISTON ON CONTRACTS 4TH § 52.45 (4th ed. 2004) ("Under the [Uniform

13   Commercial] Code, an express warranty is usually associated with a contract for the sale of goods,

14   but may be found in connection with other transactions involving goods. . . .  There is a division of

15   opinion whether the express warranty concepts in the Code are also applicable or may be extended

16   to service agreements").

17       An express warranty is a term of the parties' contract.  See *A.A. Baxter Corp. v. Colt*

18   *Industries, Inc.*, 10 Cal.App.3d 144, 153 (1970) ("A warranty is as much one of the elements of sale

19   and as much a part of the contract of sale as any other portion of the contract and is not a mere

20   collateral undertaking. . . .  [T]o constitute an express warranty, the statement must be a part of the

21   contract"); WILLISTON, *supra*, § 52.45 (stating that an express warranty is "a term of the parties'

22   contract"); see *Paularena v. Superior Court of San Diego County*, 231 Cal.App.2d 906, 915 (1965)

23   ("The damages which each set of plaintiffs seek[s] through their [breach of warranty] cause[ ] of

24   action are dependent upon their affirmance of the existence of a contract").     To prevail on a

25   breach of express warranty claim, a plaintiff must prove that the seller "(1) made an affirmation of

26   fact or promise or provided a description of its goods; (2) the promise or description formed part of

27   _____

28      [181]Motion at 23-25.

the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Rodarte v. Philip Morris, Inc.*, No. 03-0353FMC, 2003 WL 23341208, *7 (C.D. Cal. June 23, 2003). A description of the goods at issue can create an express warranty so long as it was part of the basis of the parties' bargain. See CAL. COM. CODE § 2313(l)(b).

Defendants argue that Acedo's § 2313 claim must be dismissed because he has pled no facts plausibly suggesting that GM breached an express warranty by failing to repair and replace the allegedly defective DPF.[182] Acedo counters that defendants had "ample opportunities to inspect and repair or replace the defects in material or workmanship in Plaintiffs' Trucks," but inexplicably "failed or refused to do so."[183] They do not, however, respond to defendants' assertion that the complaint fails to allege facts suggesting that GM refused to honor its warranty obligations to Acedo.

The first amended complaint contains a single allegation concerning GM's purported breach of the express warranty it gave Acedo; it alleges that "GM breached the express warranty by . . . refusing to honor the express warranty by repairing or replacing, free of charge, the DPF system or any of its component parts affected by the DPF Defects and, instead, charging for repair and replacement parts."[184] As defendants observe,[185] this allegation is conclusory and unsupported by facts. Acedo does not, for example, allege when he purportedly presented his truck to GM for servicing under the warranty or when GM purportedly refused to service the vehicle or make repairs. Nor does Acedo allege facts demonstrating that he was required to pay for repairs and replacements that were purportedly covered by GM's express warranty. Without such factual allegations, his allegation amounts to nothing more than a legal conclusion which fails to give rise to a plausible claim under *Twombly* and *Iqbal*. See, e.g., *Bogart v. Glenmark Generics, Inc., USA*, No., No. 14–CV–778 LAB DHB, 2014 WL 5800577, *6 (S.D. Cal. Nov. 7, 2014) ("Bogart claims that Glenmark represented that the birth control pills protected her from unwanted pregnancies. . . . Bogart doesn't elaborate on any facts concerning Glenmark's supposed

[182]*Id.* at 25.

[183]Opposition at 24.

[184]FAC, ¶ 208.

[185]Motion at 25.

representation or its effect on her, much less how it may have been breached.  The federal pleading standard requires her complaint to allege further factual details to allow the Court to determine whether she raises a right to relief for breach of that warranty above the speculative level.  The Court GRANTS [Glenmark's] motion to dismiss Bogart's claim for breach of express warranty," citing *Twombly*); *Mauro v. General Motors Corp.*, No. CIV. S-07-892 FCD GGH, 2008 WL 2775004, *9 (E.D. Cal. July 15, 2008) ("Here, the complaint's sole allegation [regarding] the express warranty claim is the following: 'plaintiffs have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented . . . .'  With no other facts relating to any actions by or towards the class members, the allegation is, once again, more akin to a statement of a legal requirement than a factual allegation. . . .  [D]efendant's motion to dismiss this cause of action is GRANTED").  Compare *Horvath v. LG Electronics Mobilecomm U.S.A., Inc.*, No. 3:11-CV-01576-H-RBB, 2012 WL 2861160, *6 (S.D. Cal. Feb. 13, 2012) ("Plaintiffs allege that LG Electronics instructed consumers, including Plaintiffs, to take their defective G2X phones to their cell phone carrier to address the defects.  Moreover, Plaintiffs allege that Defendant breached because Plaintiffs undertook measures to remedy the G2X defects, in accordance with LG Electronics' warranty instructions, including giving LG Electronics and its authorized sellers over ten opportunities to remedy the defects, and giving LG Electronics prelawsuit notice of the defects.  'The reasonableness of the number of repair attempts is a question of fact to be determined in light of the circumstances, but at a minimum there must be more than one opportunity to fix the nonconformity.'  Plaintiffs allege that they contacted LG Electronics and their cellular service providers on multiple occasions, as instructed, seeking effective remedies.  In *Oregel v. Am. Isuzu Motors, Inc*., 90 Cal.App.4th 1094, 1103 (2001), the court held a consumer's obligation is only to give the manufacturer or its service provider 'a reasonable opportunity to repair' the product.  Plaintiffs allege that they were not made whole and instead received replacement G2X phones that also proved defective and [were] afflicted with the same defects.  Based on the foregoing, the Court concludes that Plaintiffs allege facts to raise a right to relief for breach of LG Electronics' express warranty above the speculative level.  Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' breach of express warranty cause of action based on manufacturing defects" (citations omitted)).  Because Acedo pleads no facts indicating that he presented his truck for repair under the

terms of the express limited warranty or that GM failed to honor its obligations under that warranty, the fifth cause of action must be dismissed.

In his opposition, Acedo argues that, in addition to breaching GM's express limited warranty, defendants have also breached a separate and independent warranty arising from defendants' "disseminati[on of] affirmative representations regarding the Trucks' fuel economy and vehicle utility that became part of the bargain between Plaintiffs and Defendants and the Class and Defendants."[186] He asserts "[d]efendants claim the Trucks are fuel efficient" and that they have affirmatively represented that "the Trucks are capable of operating on a single tank of fuel for up to 680 or 700 miles."[187]  He also contends that GM touts the trucks' fuel efficiency while simultaneously marketing its suitability for mixed-use driving and daily commuting.[188]  Citing these statements, Acedo asserts that GM warranted that "the Trucks could serve the dual purpose of being a heavy duty truck that achieves 680 to 700 miles [on a single tank], including on frequent short-distance trips during the weekend when owner-lessees are expected to 'Play' and 'Live.'"[189]  Because the trucks purportedly cannot achieve the advertising mileage range, Acedo  asserts GM has breached this separate express warranty.[190]

Although Acedo correctly notes that an express warranty can arise from "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," CAL. COM. CODE § 2313(1)(a), he does not allege this theory of liability in the first amended complaint.  The pleading relies exclusively on GM's express limited warranty as the basis for the cause of action.  Acedo alleges that "GM provided all purchasers and lesser of the Trucks with the express warranty [ ], which became part of the basis of the bargain" and that "GM's express warranty

---

[186]Opposition at 23, 25-27.

[187]*Id.* at 26.

[188]*Id.*

[189]*Id.* at 26-27.

[190]*Id.* at 27.

[was] an express warranty under California law."[191]   While Acedo cites a single paragraph in the first amended complaint for the proposition that GM created an express warranty "by publicly disseminating affirmative representations regarding the Trucks' fuel economy and vehicle utility that became part of the bargain between Plaintiffs and Defendants and the Class and Defendants,"[192] the allegation merely sets forth ways in which GM purportedly breached its express limited warranty, and in fact concerns Dzieciolowski's express warranty claim under Michigan law:[193]

> "GM breached the express warranty by: (a) extending a warranty to owners or lessees of the Trucks, thereby warranting to repair or replace any defect in material or workmanship at no cost to the owner or lessee; (b) selling and leasing Trucks with DPF systems that were defective in material and workmanship, requiring repair or replacement within the warranty period; and (c) refusing to honor the express warranty by repairing or replacing, free of charge, the DPF system or any of its component parts affected by the DPF system defect and, instead, charging for repair and replacement parts."[194]

The court cannot consider a theory of liability not alleged in the complaint when deciding a motion to dismiss. *Elizabeth L.*, 2014 WL 2621408 at *4 (refusing to consider unpled theories of liability raised for the first time in opposition to a motion to dismiss).  As a result, the court dismisses the fifth cause of action for breach of express warranty. See, e.g., *id.* at *4. Cf. *Bates v. Bankers Life and Cas. Co.*, 993 F.Supp.2d 1318, 1336 (D. Or. 2014) (considering plaintiffs' novel, unpled theory" of liability only after they filed an amended complaint incorporating the theory).

### 2. Whether the Eighth Cause of Action Must Be Dismissed

Defendants also argue that Dzieciolowski's breach of express warranty claim under MICH.

---

[191]FAC, ¶ 206.

[192]Opposition at 23.

[193]A similar allegation is included in Acedo's warranty claim at paragraph 208.

[194]FAC, ¶ 238.

COMP. LAWS § 440.2313 must be dismissed.[195]  Section 440.2313 states that "[a]n affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that goods shall conform to the affirmation or promise."  MICH. COMP. LAWS § 440.2313(1)(a).  See also, e.g., *Austin v. Mitsubishi Electronics America, Inc.*, 966 F.Supp. 506, 516 (E.D. Mich. 1997) ("[A]n express warranty is created by a seller making a promise or affirmation regarding goods with the intent that they will conform.  An express warranty may also arise if the statements would lead a reasonable buyer to believe that such statements had been made to induce the bargain," citing *Hansen v. Firestone Tire and Rubber Co.*, 276 F.2d 254, 257 (6th Cir. 1960); *Guaranteed Construction v. Gold Bond Products*, 153 Mich.App. 385, 390 (1986)).

As noted, the basis for plaintiffs' express warranty claims is GM's limited warranty, which provides that GM will inspect and repair or replace defects in material or workmanship in its trucks.[196]  As with Acedo's California Commercial Code § 2313 claim, Dzieciolowski alleges that GM breached this warranty by: "(a) extending a warranty to owners or lessees of the Trucks, thereby warranting to repair or replace any defect in material or workmanship at no cost to the owner or lessee; (b) selling and leasing Trucks with DPF systems that were defective in material and workmanship, requiring repair or replacement within the warranty period; and (c) refusing to honor the express warranty by repairing or replacing, free of charge, the DPF system or any of its component parts affected by the DPF system defect and, instead, charging for repair and replacement parts."[197]

Unlike Acedo, Dzieciolowski alleges that he presented his truck while under warranty to two GM dealerships for service related to the DPF; in both instances, the dealerships purportedly refused to repair the DPF and instead told Dzieciolowski his truck was "operating normally."[198]  Defendants do

---

[195]Motion at 23-25.

[196]FAC, ¶¶ 236-38.

[197]*Id.*, ¶ 238.

[198]*Id.*, ¶ 112 ("[T]wo separate certified GM dealerships have had multiple chances to correct the constant regeneration of Plaintiff Dzieciolowski's Chevrolet Silverado 3500HD beginning at least on or around September 2012.  Neither dealership has been able to resolve the issues or provide a solution.  Rather, they stated that Plaintiff Dzieciolowski's Truck was operating normally.  To date, Plaintiff

not challenge the sufficiency of these allegations; instead, they argue that Dzieciolowski's claim must be dismissed because the first amended complaint does not allege he relied on the limited express warranty in purchasing his vehicle.[199]

As Dzieciolowski concedes,[200] a plaintiff must allege facts plausibly showing that he relied on an express warranty in purchasing his vehicle to state a claim for breach of express warranty under § 440.2313.  See MICH. COMP. LAWS § 440.2313(1)(a) ("An affirmation of fact or promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain* creates an express warranty that goods shall conform to the affirmation or promise" (emphasis added); see also, e.g., *Baye v. HBI Branded Apparel Enterprises*, No. 12-CV-12869, 2013 WL 6546815, *4-5 (E.D. Mich. Dec. 13, 2013) (noting that "evidence of reliance on defendants' purported express warranties . . . would be required for express warranty . . . claims," citing *Skinner v. Square D Co.*, 445 Mich. 153, 158-59 (1994)); *Austin v. Mitsubishi Electronics America, Inc.*, 966 F.Supp. 506, 516-17 (E.D. Mich. 1997) (observing that reliance is a required element of a breach of express warranty claim under Michigan law).

Dzieciolowski argues, however, that the claim should not be dismissed because he was "not only aware of GM's vehicle warranty but also relied on the warranty as another material reason to purchase the Truck[ ]."[201]  He asserts that it is "unsurprising" that he relied on GM's limited warranty in purchasing the truck because "GM has historically used a generous 100,000 mile powertrain warranty to differentiate itself from rival auto manufacturers such as Ford, Toyota, and Honda, which only offer a 60,000 mile powertrain warranty."[202]  Dzieciolowski cites no *factual allegations in the first amended complaint* to this effect.  While such allegations would likely be sufficient to plead reliance under

Dzieciolowski's Truck, like other Class Members', has been out of service in excess of 35 days as a result of the regeneration, causing him injury and damages from the loss of his vehicle").

[199]Motion at 25.

[200]Opposition at 25.

[201]Opposition at 25.

[202]*Id.*

43

Michigan law, they must be included in the complaint, not raised in opposition to a motion to dismiss. *Schneider v. California Department of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998) ("[I]n determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"); *Phillips v. Bank of America, N.A.*, Civil No. 10-00551 JMS-KSC, 2011 WL 2160583, *7 n. 5 (D. Haw. June 1, 2011) (plaintiffs "may not rely on facts stated in their [o]pposition that were not pled in the [first] [a]mended [c]omplaint"). The eighth cause of action must therefore be dismissed.[203]

### F.    Breach of Implied Warranty of Merchantability Claims

#### 1.    Whether the Fourth Cause of Action Must Be Dismissed

The Song–Beverly Consumer Warranty Act ("Song-Beverly Act") was enacted to regulate warranties and strengthen consumer remedies for breaches of warranty. *National R.V., Inc. v. Foreman*, 34 Cal.App.4th 1072, 1077 (1995). The act is intended to protect purchasers of "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables."

---

[203]Defendants contend that the claim must also be dismissed because Dzieciolowski did not present his truck for repairs in "unaltered condition" as required by GM's limited warranty. (Motion at 25 n. 8 ("But there is more. While Mr. Dzieciolowski alleges in conclusory terms that he presented his truck for repairs on multiple occasions to several, unidentified dealers, he does not – and GM believes *cannot* – allege that he presented the truck for repairs in *unaltered condition*. This is not a mere quibble, as GM records of its contacts with the dealers show *multiple alterations to his Duramax powertrain*, which disqualify it for warranty coverage" (emphasis original).) Dzieciolowski counters that he made only "cosmetic" aftermarket alterations not related to the powertrain and that they did not disqualify his vehicle under the warranty. (Opposition at 24-25.)

There are no allegations in the complaint concerning purported aftermarket alterations. Instead, defendants seek to have the court rely on extrinsic evidence proffered with their motion. As noted, the court's consideration of a motion to dismiss is confined to the pleadings. See, e.g., *In re American Continental Corporation/Lincoln Sav. & Loan Securities Litigation*, 102 F.3d 1524, 1537 (9th Cir. 1996), ("In general, material outside the pleadings cannot be considered in ruling on a motion to dismiss, unless the motion is treated as one for summary judgment and the parties are 'given reasonable opportunity to present all material made pertinent to such a motion by Rule 56,'" citing Fed.R.Civ.Proc. 12(b)), rev'd on other grounds *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998). The court therefore declines to consider defendants' argument. Even if the question were properly before the court, the parties' dispute concerns the substantive merit, as opposed to adequate pleading, of Dzieciolowski's claim. Only the sufficiency of the pleading is properly considered at this stage.

CAL. CIV. CODE § 1791(a).  Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state.  CAL. CIV. CODE § 1792; see also *Music Acceptance Corp. v. Lofing*, 32 Cal.App.4th 610, 619 (1995).

As defined in the Song-Beverly Act, an implied warranty of merchantability guarantees that "consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; [and] (4) Conform to the promises or affirmations of fact made on the container or label."  CAL. CIV. CODE § 1791.1(a).  "Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. . . . [I]t provides for a minimum level of quality."  *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1295–96 (1995).

Defendants argue that Acedo's breach of implied warranty claim must be dismissed because the first amended complaint does not plead that "the alleged DPF defect or the frequency of regeneration forced him to stop driving his truck."[204]  The implied warranty of merchantability set forth in § 1791.1(a) requires only that a vehicle be reasonably suited for ordinary use.  See, e.g., *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003) (a plaintiff claiming that an implied warranty has been breached must show that the product "did not possess even the most basic degree of fitness for ordinary use," citing CAL. COM. CODE § 2314(2)).  Stated differently, it need not be perfect in every detail so long as it "provides for a minimum level of quality."  *American Suzuki*, 37 Cal.App.4th at 1296 (quoting *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1191 (N.D.Ill.), rev'd. on other grounds, 660 F.2d 311 (7th Cir. 1981)).  The basic inquiry, therefore, is whether the vehicle was fit for driving.  See *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) ("Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects.  Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable"), cert. denied, 495 U.S. 904 (1990); *Skelton*, 500 F.Supp. at 1191 ("Automobiles are designed for driving, and therefore the question in

---

[204]Motion at 26.

this case is whether the GM vehicles at issue were fit for that purpose"); *American Suzuki*, 37 Cal.App.4th at 1296 ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation").

Whether a car provides a "minimum level of quality" is not determined by the manner in which it is operating at the time of sale. A vehicle that operates for some time after purchase may still be deemed "unfit for ordinary purposes" if its components are so defective that the vehicle becomes inoperable within an unacceptably short period of time. See, e.g., *Hornberger v. General Motors Corp.*, 929 F.Supp. 884, 888 (E.D. Pa. 1996) ("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable"). Thus, the "'implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale,' so '[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery.'" *Ehrlich*, 801 F.Supp.2d at 922 (quoting *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1305–06 (2009)).

Acedo asserts that, in addition to "reduce[d] fuel economy and vehicle utility," the DPF Defects also resulted in frequent regeneration cycles that "materially hinder[ ] Plaintiffs' and the Class' ability to drive their trucks from point A to point B on short-distance trips because regeneration requires them to 'KEEP DRIVING' or risk very expensive repairs."[205] He cites a single allegation in the first amended complaint that he contends supports their assertion that the vehicle was not of merchantable quality because plaintiffs, including Acedo, have had their ability to drive their trucks "materially hindere[d]" by being required to continue driving during regeneration cycles:

> "Although the Diesel Supplement to the vehicle Owner's Manual includes a warning about the Trucks' need for regeneration, prospective buyers are not informed of this fact before purchase. The Diesel Supplement states:

---

[205]Opposition at 27-28.

1    'If the vehicle is used for numerous short trips or extended slow-speed

2    operation, the engine computer may not be able to adequately heat up the

3    exhaust system to clean the DPF effectively.  The engine computer has

4    been designed to continuously monitor the condition of the DPF.  When

5    the engine computer detects that the DPF is nearly full of particulates and

6    that the vehicle is not being operated in a manner that would allow

7    effective automatic DPF cleaning, the Driver Information Center will

8    display the message CLEANING EXHAUST FILTER KEEP DRIVING

9    UNTIL MESSAGE IS CLEARED.  If the vehicle continues to be driven

10   in a manner that prevents effective DPF cleaning, the DPF will become

11   plugged with particulates.  If this occurs, the engine computer will turn

12   on the service engine soon light in the instrument cluster and the DIC

13   will display the message ENGINE POWER IS REDUCED. . . .'"[206]

14   While this allegation, accepted as true, suggests that a driver *may* be prompted to keep driving

15   if the exhaust system has not been adequately heated on short trips or slow-speed operation, it does not

16   suggest that Acedo experienced the purported DPF Defects in a way that "materially hinder[ed]" his

17   ability to drive his truck.  Nor does it plausibly suggest that Acedo's vehicle "did not meet the

18   'minimum level of quality' contemplated by the implied warranty." *Kas v. Mercedes-Benz USA, LLC*,

19   No. CV 11-1032 GHK (PJWx), 2011 WL 5248299, *2 (C.D. Cal. Oct. 31, 2011).

20   Absent an allegation that Acedo was required to "keep driving" beyond his destination to permit

21   completion of the regeneration process, the court cannot conclude that he has plausibly alleged that his

22   truck was of non-merchantable quality due to the DPF Defects. See, e.g., *Tae Hee Lee v. Toyota Motor*

23   *Sales, U.S.A., Inc.*, 992 F.Supp.2d 962, 980 (C.D. Cal. 2014) ("In this case, Plaintiffs have not alleged

24   that they stopped using their vehicles.  In addition, Plaintiffs have not and cannot truthfully allege in

25   light of the IIHS report that their pre-collision braking feature failed to automatically slow their vehicles

26   in an unavoidable frontal collision.  Accordingly, Defendant's Motion with respect to Plaintiffs' second

27

28   [206]FAC, ¶ 39.

47

claim for breach of the implied warranty of merchantability is GRANTED" (citations omitted));

*Taragan v. Nissan North America, Inc.*, No. 09-3660 SBA, 2013 WL 3157918, *4 (N.D. Cal. June 20, 2013) ("'In the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation.' A vehicle fit for the ordinary purpose of providing transportation is one that can do so 'in safe condition and substantially free of defects.' Here, the FAC alleges that Nissan's vehicles are not merchantable because there is a 'risk' that vehicles equipped with the Intelligent Key system will roll away if the operator fails to place the transmission in park after shutting off the engine. In asserting a warranty claim, however, '[i]t is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect.' Here, none of the Plaintiffs has actually experienced a rollaway incident" (citations omitted)). Compare *Arteaga v. Carmax Auto Superstores West Coast, Inc.*, No. CV-14-1888 RSWL (CWx), 2014 WL 3505527, *5 (C.D. Cal. July 11, 2014) ("The Court hereby DENIES Defendants' Motion to Dismiss Plaintiffs' claim for breach of implied warranty of merchantability because Plaintiffs plead sufficient facts showing that they were unable to use the vehicle within the implied warranty's duration. Plaintiffs describe defects such as a defective engine, defective tail light bulbs, a defective front parking light, squeaking when turning the steering wheel, and squeaking brakes. Defendants' argument focuses entirely on the minor defects pled and overlooks the fact that the engine was not functioning properly. A defective engine may imply that the car was unsafe or unfit for driving because a car with a defective engine cannot be driven"); *Kas*, 2011 WL 5248299 at *2 ("The FAC's fourth claim alleged that, under the Song-Beverly Act, the Class Vehicles are 'not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their radiators are defective due to the Radiator Defect and the resulting damage and safety-related hazards that it can cause.' In dismissing this claim, we held that Plaintiff had failed to sufficiently allege facts showing that the vehicle did not meet the 'minimum level of quality' contemplated by the implied warranty. MBUSA argues the SAC does not allege any new facts with respect to this claim. The FAC alleged that, because of the Radiator Defect, glycol fluid contaminated Plaintiff's automatic transmission fluid and transmission system. As a result of this damage to the transmission system, Plaintiff

48

experienced 'an abnormal shifting of the transmission,' a 'jerking when changing gears,' and 'a noise coming from under the vehicle.'  To this, the SAC adds: '[T]he kicking, sluggishness, jerking, etc., that Plaintiff experienced and continues to experience with her vehicle has over time become so severe that it has caused her to suddenly and unexpectedly experience longer delays in acceleration . . . thereby putting her at a risk of a car accident.'  Plaintiff alleges that this 'kicking, jerking, delayed acceleration, etc.' occurs 'when her vehicle, during normal operation, suddenly and unexpectedly pulls back (i.e., jolts), hesitates, and then takes off like a slingshot.'  We conclude that Plaintiff's SAC sufficiently alleges facts in support of her fourth claim," citing *Isip v. Mercedes-Benz USA, LLC*, 155 Cal.App.4th at 22).

Because Acedo has failed to allege sufficient *facts* demonstrating that his vehicle "did not meet the 'minimum level of quality'" contemplated by the Song-Beverly Act, the fourth cause of action for breach of the implied warranty of merchantability must be dismissed.

### 2.    Whether the Seventh Cause of Action Must Be Dismissed

Defendants argue that Dzieciolowski's claim for breach of the implied warranty of merchantability under Michigan Compiled Law § 440.2314 must be dismissed because Dzieciolowski is not in privity with GM.[207]  Dzieciolowski contends that privity is not required under Michigan law.[208]  The court declines to dismiss the claim for failure to allege privity between Dzieciolowski and GM.

"The Michigan Supreme Court has not yet ruled on whether privity is required to bring an implied-warranty claim under the M[ichigan Uniform Commercial Code]." *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006).  Lower Michigan courts have reached conflicting conclusions as to whether privity is required to assert a claim under § 2314.  Compare *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 608-09 (1970) ("Although the Michigan Supreme Court has not in so many words declared that a consumer may recover from a manufacturer for breach of implied warranty without proving negligence and without regard to privity even in a case where the product is not

---

[207]Motion at 26 ("Plaintiff Dzieciolowski's implied warranty claim under sections 2314 and 2315 of the Michigan UCC fails because he is not in privity of contract with GM, having purchased his truck from the independent Whelan dealership").

[208]Opposition at 28.

inherently dangerous and no personal injuries have been suffered, the loss being entirely economic, we are persuaded from our review of the foregoing decisions of our Supreme Court and from the trend of authorities in other jurisdictions that a consumer can sue a manufacturer directly for economic loss resulting from a defect in a product attributable to the manufacturer without proving negligence") with *Auto Owners Insurance Co. v. Chrysler Corp.*, 129 Mich.App. 38, 42-43 (1983) (concluding that privity was required to state a claim for breach of the implied warranty of merchantability); see also *Great American Insurance Co. v. Paty's Inc.*, 154 Mich.App. 634, 642 (1986) ("However, under Michigan law, vertical privity is not required even where the damages at issue consist solely of economic losses, i.e., damage to the subject goods themselves.  While the UCC takes no official position on the issue of vertical privity, the practice commentary to § 2–318 found at 21 M.C.L.A. 363 notes that the Michigan decisions on the question of privity are not affected by the Code.  The Michigan cases which have considered the question have held that it is unnecessary to establish vertical privity, even where the loss is solely economic").

In support of their contention that privity is a required element of a breach of implied warranty claim under Michigan law, defendants cite *Harnden v. Ford Motor Co.*, 408 F.Supp.2d 315, 321-22 (E.D. Mich. 2005).  In *Harnden*, the court found that privity was a required element of a breach of implied warranty claim.  *Harnden*, 408 F.Supp.2d at 321.  Recognizing that the Michigan Supreme Court had not definitively addressed whether a § 440.2314 claim necessitated prrof of privity, the court, with little analysis, concluded, like "numerous other judges in the Eastern and Western Districts of Michigan," that a consumer must "be in privity of contract with a remote manufacturer to state a breach of implied warranty claim seeking purely economic damages under § 440.2314."  *Id.* at 322 (collecting authority).

As Dzieciolowski notes, however, the Sixth Circuit, in a published opinion that issued after *Harndon*, unequivocally held that "Michigan ha[d] abandoned the privity requirement for implied-warranty claims."  *Pack v. Damon Corp.*, 434 F.3d 810, 820 (6th Cir. 2006).  In *Pack*, the district court dismissed plaintiff's breach of implied warranty claim because Pack was not in privity with defendant Damon Corp.  *Pack*, 434 F.3d at 812-13.  On appeal, Pack argued that the district court erred because Michigan law did not require that a consumer be in privity with a manufacturer to assert a breach of

50

1  implied warranty claim for economic losses.  *Id.*  The Sixth Circuit agreed, concluding that Michigan

2  had abandoned the traditional privity requirement for implied warranty claims.  *Id.* at 820.

3       The Sixth Circuit observed that, prior to adoption of the Uniform Commercial Code, the

4  Michigan Supreme Court had rejected the traditional privity requirement for implied warranty claims

5  in *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120 (1958).  *Pack*, 434 F.3d at

6  819.  It next observed that several Michigan courts had cited *Spence* with approval following adoption

7  of the Michigan Uniform Commercial Code, and held that "privity [was] not required to sustain an

8  implied-warranty claim for economic losses."  *Id.* at 818 (citing *Reid v. Volkswagen of America, Inc.*,

9  512 F.2d 1294, 1298 (6th Cir. 1975); *Michels v. Monaco Coach Corp.*, 298 F.Supp.2d 642, 646-47 (E.D.

10  Mich. 2003); *Southgate Community School District v. West Side Construction Co.*, 399 Mich. 72, 76

11  n. 1 (1976); *Williams v. Polgar*, 391 Mich. 6, 15-16 (1974); *Cova v. Harley Davidson Motor Co.*, 26

12  Mich.App. 602, 604-06 (1970); *Gautheir v. Mayo*, 77 Mich.App. 513, 514-15 (1977)).

13       The Sixth Circuit found particularly persuasive the Michigan Court of Appeal's opinion in *Cova*,

14  which held that "a consumer can sue a manufacturer directly for economic loss resulting from a defect

15  in a product attributable to the manufacturer."  *Pack*, 434 F.3d at 819 (citing *Cova*, 26 Mich.App. at 609-

16  10).  It noted the *Cova* court's reasoning that pre-UCC cases, such as *Spence*, remained persuasive given

17  the Michigan courts' recognition that the adoption of the Michigan Uniform Commercial Code was

18  "neutral as to its effect on consumer remedies and . . . neither enlarges nor restricts 'the developing case

19  law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the

20  distributive chain.'"  *Id.* at 818-19.

21       Notwithstanding contrary authority, the Sixth Circuit noted that the Michigan Court of Appeals

22  in *Auto Owners Insurance Co. v. Chrysler Corp.*, 129 Mich.App. 38 (1983), had "departed from th[ose]

23  cases without explanation and held that privity was required to bring a claim for breach of an implied

24  warranty for economic loss."  *Id.*  The *Pack* court concluded that *Auto Owners* was not persuasive,

25  noting that it had not explained its disagreement with *Cova* and its progeny, and that the Michigan Court

26  of Appeals had "shed serious doubt" on the *Auto Owners* decision.

27       The court finds the reasoning in *Pack* more persuasive than the minimal reasoning offered by

28  *Herndon* and concludes that, under Michigan law, privity is not required for a consumer to state a breach

of implied warranty claim against a manufacturer.  Although defendants argue that this conclusion conflicts with *Auto Owners*,[209] the court finds that case unpersuasive.  As the Sixth Circuit noted, the *Auto Owners* court disregarded *Cova*, a case that is directly analogous to this one, and that held that privity was required under Michigan law.  Moreover, although *Auto Owners* has not been expressly overruled, the Michigan Court of Appeals has criticized its reasoning and credited the reasoning of Judge Danhof's dissent.  See, e.g., *Great American Insurance Co.*, 154 Mich.App. at 641-42 ("Furthermore, the dissent in *Auto-Owners* makes a strong argument for the proposition that a contractual relationship is unnecessary to invoke the rule stated in *McGhee* [*v. GMC Truck & Coach Division, General Motors Corp.*, 98 Mich.App. 495 (1980)]. The dissent points out that the majority opinion is based upon the premise that a buyer cannot, under the UCC, proceed against a remote seller. However, under Michigan law, vertical privity is not required even where the damages at issue consist solely of economic losses, i.e., damage to the subject goods themselves.  While the UCC takes no official position on the issue of vertical privity, the practice commentary to § 2–318 found at 21 M.C.L.A. 363 notes that the Michigan decisions on the question of privity are not affected by the Code. The Michigan cases which have considered the question have held that it is unnecessary to establish vertical privity, even where the loss is solely economic.  The dissenting opinion in *Auto-Owners* concludes that, even where the defendant is a remote seller with whom the consumer has had no contract, the rule set out in *McGhee* is applicable" (citations omitted)).  Given the minimal reasoning provided by the *Auto Owners* court and the Michigan Court of Appeals' subsequent criticism of the decision, the court declines to follow *Auto Owners*.

Defendants' attempt to distinguish the authority on which the Sixth Circuit relied in *Pack* is unavailing. Defendants argue that *Cova* involved commercial purchasers rather than consumers and that it is distinguishable from the case at bar, since plaintiffs purchased their trucks for consumer, rather than commercial, use.[210]  Defendants' interpretation of *Cova*, however, is belied by the opinion.  The Court of Appeals there concluded that "a consumer can sue a manufacturer directly for economic loss resulting

[209]Reply at 17-18.

[210]*Id.* at 19.

from a defect in a product attributable to the manufacturer without proving negligence." *Cova*, 26 Mich.App. at 609. There is no indication in the opinion that the court's conclusion was limited to cases in which a customer purchased a product from the manufacturer for commercial uses.

In sum, for the reasons stated, the court is persuaded by the Sixth Circuit's reasoning in *Pack* and predicts that the Michigan Supreme Court would conclude that a consumer can recover from a manufacturer on an implied warranty claim for economic losses without establishing privity. See *Pack*, 434 F.3d at 819. Defendants' motion to dismiss Dzieciolowski's breach of implied warranty claim under § 440.2314 is therefore denied.

### G.    Whether the Ninth Cause of Action Must Be Dismissed

Defendants next seek dismissal of plaintiffs' ninth cause of action, which alleges a violation of the Magnuson-Moss Warranty Act ("MMWA").[211] The MMWA permits a "consumer" to sue for damage caused "by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this [act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1). The MMWA narrowly defines "written warranty." The term means:

"(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (B) any understanding in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or understanding becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product." 15 U.S.C. § 2301(6).

As used in the MMWA, the term implied warranty "means an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301(7); *Barabino*

---

[211]Motion at 26-27.

*v. Dan Gamel, Inc.*, No. 2:04-cv-2359-MCE-PA, 2006 WL 2083257, *4 (E.D. Cal. July 25, 2006) ("[W]hile the Plaintiff's MMWA claim constitutes a separate federal cause of action for breach of an implied warranty, courts must look to the relevant state law to determine the meaning and creation of an implied warranty"); see also *Stearns v. Select Comfort Retail Corp.*, No. C 08-2746 JF, 2009 WL 1635931, *9 (N.D. Cal. June 5, 2009) ("[The MMWA] does not expand the rights under [state law warranty] claims, and dismissal of the state law claims requires the same disposition with respect to an associated MMWA claim").

　　As both parties recognize, plaintiffs' MMWA claim rises or falls with their state law claims for breach of express warranty and breach of the implied warranty of merchantability.[212]  See *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("The district court held – and Clemens does not dispute – that the claims under the Magnuson-Moss Act stand or fall with his express and implied warranty claims under state law.  Therefore, this court's disposition of the state law warranty claims determines the disposition of the Magnuson-Moss Act claims," citing *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004)); see also, e.g., *Robbins v. Hyundai Motor America*, No. SACV 14-00005-JLS (ANx), 2015 WL 304142, *11 (C.D. Cal. Jan. 14, 2015) ("Plaintiff's claim under the Magnuson-Moss Warranty Act is dependent on Plaintiff's claims under [state law]" (citation omitted)); *In re Ford Tailgate Litigation*, No. 11-CV-2953-RS, 2014 WL 1007066, *5 (N.D. Cal. Mar. 12, 2014) ("[C]laims under the Magnuson-Moss Act stand or fall with [plaintiffs'] express and implied warranty claims under state law" (citation omitted)); *Daniel v. Ford Motor Co.*, No. CIV. 2:11-02890 WBS EFB, 2013 WL 3146810, *3 (E.D. Cal. June 18, 2013) ("Here, the parties agree that, as in *Clemens*, . . . 534 F.3d 1017 . . . , Daniel's Magnuson-Moss Warranty Act claim 'stand[s] or fall[s] with [her] . . . implied warranty claim[ ] under state law'").  Dzieciolowski has adequately stated a breach of implied warranty claim under § 440.2314.  Accordingly, the court denies defendants' motion to dismiss plaintiffs' ninth cause of action for violation of the MMWA to the extent it is based on the violation of Michigan law alleged in seventh cause of action.  To the extent the MMWA claim is based on the violations of California and Michigan law alleged in the fourth, fifth, and eighth causes of action, the court grants

---

[212]Motion at 27; Opposition at 28-29.

1  defendants' motion to dismiss the MMWA claim.

2  **H.   Whether the Tenth Cause of Action Must Be Dismissed**

3  Finally, defendants seek dismissal of the tenth cause of action for violation of the Michigan

4  Motor Vehicle Service Repair Act ("MVSRA"), MICH. COMP. LAWS § 257.1307.[213]  The MVRSA

5  provides that "[a] person subject to th[e] act shall not engage or attempt to engage in a method, act, or

6  practice which is unfair or deceptive." MICH. COMP. LAWS § 257.1307.  As is relevant here, only "motor

7  vehicle repair facilities" are subject to the MVSRA.  See, e.g., *Liss v. Lewiston-Richards, Inc.*, 478

8  Mich. 203, 227 n. 13 (2007) ("The MVSRA establishes an extensive regulatory scheme for motor

9  vehicle repair facilities"); *Campbell v. Sullins*, 257 Mich.App. 179, 187 (2003) ("Ultimately, on the

10  basis of the plain language of the MVSRA . . . it must be established that defendant was operating a

11  motor vehicle repair facility"), superseded by statute on other grounds as recognized in *Edwards*

12  *Publications, Inc. v. Kasdorf*, No. 310907, 2014 WL 783540 (Mich. App. Feb. 25, 2014) (Unpub. Disp.).

13  A "motor vehicle repair facility" is:

14  "[A] place of business which engages in the business of performing or employing

15  persons who perform maintenance, diagnosis, vehicle body work, or repair service on

16  a motor vehicle for compensation, but excluding all of the following:

17  (i)   A person who engages only in the business of repairing the motor

18  vehicles of a single commercial or industrial establishment or

19  governmental agency;

20  (ii)   A person repairing his or her own or a family member's car; or

21  (iii)   A business that does not diagnose the operation of a motor

22  vehicle, does not remove parts from a motor vehicle to be

23  remachined, and does not install finished machined or

24  remachined parts on a motor vehicle, not including a motor

25  vehicle repair facility that engages in the business of performing

26  or employing persons who perform vehicle body work." MICH.

27

28  [213]Motion at 27-28.

55

1    COMP. LAWS § 257.1302(g).

2    Defendants argue that Dzieciolowski's claim for violation of the MVSRA must be dismissed

3    because the first amended complaint pleads no facts plausibly suggesting that GM "engages in the

4    business of performing or employing persons who perform maintenance, diagnosis, vehicle body work,

5    or repair service on a motor vehicle" as required by the act.[214]  Plaintiffs appear to concede that GM is

6    not itself a "motor vehicle repair facility" under the MVSRA.[215]  They nonetheless argue that GM can

7    still held liable because its "authorized independent dealerships" qualify as motor vehicle repair

8    facilities and their liability can be imputed to GM because they are its actual and apparent agents.[216]

9    Plaintiffs contend that GM "cloak[s] [ ] its authorized independent dealerships [in] an effort to offer

10   Plaintiffs and the Class a standardized GM brand experience" and that "[e]ach dealer in GM's

11   authorized independent dealership network is cloaked with so much apparent authority that Plaintiffs

12   and the Class could and did reasonably conclude that the dealers are GM's agents."[217]

13   As defendants observe,[218] Dzieciolowski does not plead facts supporting this theory of liability.

14   The first amended complaint makes no reference to GM's authorized independent dealerships and does

15   not allege that the dealerships are GM's agents.  Indeed, although Dzieciolowski discusses facts in

---

18   [214]Motion at 27 ("[O]nly a 'motor vehicle repair facility' is 'subject to' the MVSRA.  MCL §

19   257.1302(g) defines that term as 'a place of business which engages in the business of performing or employing persons who perform maintenance, diagnosis, vehicle body work, or repair service on a

20   motor vehicle for compensation,' with exceptions not here relevant.  Plaintiff does not allege that GM engages in such a business.  Authorized independent dealerships, not GM, have places of business where

21   vehicle diagnosis and repairs are provided for compensation").

22   [215]Opposition at 29.

23   [216]Id. at 29-30.  See also id. at 29 ("However, GM's dealers are both actual agents and agents

24   cloaked with apparent authority such that GM is also a 'motor vehicle repair facility' under MCL § 257.1302(g)").

25   [217]Id. at 29-30 ("Accordingly, under principles of agency law, GM is a 'motor vehicle repair

26   facility' for purposes of MCL § 257.1302(g) because Dzieciolowski and the Michigan Subclass could and did reasonably believe their respective dealer was an agent of GM").

27   [218]Reply at 21 ("The Opposition tries to salvage this claim based on an unpleaded agency

28   theory").

56

opposition that purportedly illustrate the dealerships' apparent authority to act on GM's behalf,[219] these facts are not pled in the complaint.  As the court has noted repeatedly, plaintiffs "may not rely on facts stated in their [o]pposition that were not pled in the [first] [a]mended [c]omplaint." *Phillips v. Bank of America, N.A.*, Civil No. 10-00551 JMS-KSC, 2011 WL 2160583, *7 n. 5 (D. Haw. June 1, 2011); see also, e.g., *Schneider*, 151 F.3d at 1197 n. 1 ("Perhaps recognizing that their complaint was (at best) ambiguous, the inmates insisted in their memorandum to the district court opposing the State's motion to dismiss that their ITAs do indeed earn interest but that the interest is credited to the Inmate Welfare Fund rather than to them as individual prisoners.  The 'new' allegations contained in the inmates' opposition motion, however, are irrelevant for Rule 12(b)(6) purposes.  In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.  The focus of any Rule 12(b)(6) dismissal – both in the trial court and on appeal – is the complaint," citing *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993); Moore's Federal Practice § 12.34[2] ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)")); *Bruton*, 961 F.Supp.2d at 1078 ("In order to cure the deficiencies in the FAC, Bruton asserts new factual allegations regarding Nestle USA in a footnote to her opposition.  For example, Bruton contends that, for at least a portion of the class period, Nestle USA operated and controlled the Gerber verybestbay.com website.  Bruton's new factual allegations do not cure the defects in the FAC because, '[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a motion to dismiss," citing *Broam v. Bogan*, 320 F.3d 1023, 1026 n. 2 (9th Cir. 2003)).

        As courts routinely recognize, it is improper for plaintiffs to assert unpled theories of liability

---

    [219]Opposition at 29 ("Most GM dealerships do not sell new models of other makes.  For example, the dealerships where Plaintiffs purchased their Trucks do not sell new Fords or Toyotas.  GM's authorized independent dealerships also share similar architecture, exterior colors, and interior decor.  These dealerships utilize visually identical branding vis-a-vis signage, employee uniforms, and sales tactics.  More important, dealers receive service and training support from GM so that different dealers across Michigan and nationwide approach troubleshooting and solutions in a standardized way").

in opposition to defendants' Rule 12(b)(6) motion to dismiss.  See, e.g., *Nathanson v. Polycom, Inc.*, 2015 WL 1517777 at *13 ("Plaintiff argues in his opposition brief that Item 402 of SEC Regulation S-K required Polycom to disclose all compensation provided to Miller in Form 10-Ks and proxy statements.  However, Plaintiff has not pleaded these allegations in his complaint.  As a result, the Court does not address them," citing *Bruton*, 961 F.Supp.2d at 1078); *Elizabeth L.*, 2014 WL 2621408 at *4 (declining to consider unpled theories of liability raised for the first time in opposition to defendant's motion to dismiss).  Cf. *Bates*, 993 F.Supp.2d at 1336 (considering a plaintiff's "novel, unpled theory" of liability only after plaintiff filed an amended complaint incorporating the theory).  The court therefore declines to consider plaintiffs' unpled allegations of an agency relationship between GM and the independent authorized dealerships.

Because Dzieciolowski pleads no facts demonstrating that GM is a motor vehicle repair facility as that term is defined in the MSVRA, the court must dismiss the tenth cause of action.  See *Campbell*, 257 Mich. App. at 187 ("Ultimately, on the basis of the plain language of the MVSRA . . . it must be established that defendant was operating a motor vehicle repair facility.  Therefore, pursuant to the statutory definition of a motor vehicle repair facility, plaintiff has a cause of action only if defendant was operating a 'place of business' engaged in the business of performing automotive repair and maintenance services for compensation," citing MICH. COMP. LAWS § 257.1302(g)).

### III.  CONCLUSION

For the reasons stated, the court grants in part and denies in part defendants' motion to dismiss.  The court grants defendants' motion to dismiss Acedo's affirmative misrepresentation claim under the CLRA, his second and third causes of action for violations of the UCL, and his claims for breach of express warranty and violation of the Song-Beverly Consumer Warranty Act.  The court also grants defendants' motion to dismiss Dzieciolowski's claims for breach of express warranty under Michigan law and violation of the MSVRA, and plaintiffs' claim for violation of the MMWA to the extent it is based on Acedo's warranty claims and Dzieciolowski's express warranty claim.  The court denies defendants' motion to dismiss Acedo's fraudulent omission claim under the CLRA, Dzieciolowski's claims for violation of the MCPA and breach of the implied warranty of merchantability, and plaintiffs'

ninth cause of action for violation of the MMWA to the extent that it is based on Dzieciolowski's implied warranty claim under Michigan law.  Dismissal is with leave to amend.  See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir. 2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Plaintiffs may file an amended complaint within twenty (20) days of the date of this order if they are able to remedy the deficiencies the court has noted.

Plaintiffs may not plead new claims.  Should the scope of any amendment exceed the scope of leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f).  See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also *Barker v. Avila*, No.

59

09-CV-00001-GEB-JFM, 2010 WL 3171067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to federal law claim where the court had granted leave to amend only state law claims).[220]

DATED: July 31, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[220]It is not at all clear how DMAX was involved in the purportedly misleading representations and omissions that form the basis for plaintiffs' CLRA, UCL, and MCPA claims.  As noted, plaintiffs allege that "defendants" – i.e., GM and DMAX – are liable under the CLRA because they affirmatively misrepresented the trucks' fuel range and economy, and concealed material facts related to the DPF Defects and Fuel Penalty.  (See generally FAC, ¶¶ 156-67.)  Plaintiffs allege on the same basis that GM and DMAX are jointly liable for violations of the UCL and MCPA.  (See id., ¶¶ 173-96, 212-26.)  The *facts* alleged in the complaint deal solely with GM's actions, however, and appear to indicate that the purported misrepresentations and omissions were solely attributable to it.  (See id., ¶¶ 29-52, 80-110.)  It is thus unclear what conduct of DMAX, if any, is implicated.

Similarly, each plaintiff alleges that GM and DMAX jointly breached the implied warranty of merchantability (see id., ¶¶ 197-203, 227-33).  Dzieciolowski also alleges that DMAX is liable for a violation of the MVSRA.  (See id., ¶¶ 254-57.)  It does not appear, however, that plaintiffs have pled facts plausibly suggesting that DMAX breached an implied warranty or violated the MVSRA; once again, the relevant factual allegations appear to relate solely to GM.  (See generally id., ¶¶ 29-52, 80-110.)

DMAX, however, does not seek dismissal on this basis, and the court therefore declines to do so.  The court raises the issue so that plaintiffs can consider this possible deficiency when drafting an amended complaint.